Proceeding by Louis J. Auerbacher, Jr., against Henrietta Auerbacher, and Florida National Bank of Jacksonville, as executors of the estate of Louis J. Auerbacher, deceased, to revoke probate of will. From a judgment decreeing will invalid, executors appeal.
Judgment affirmed.
Louis J. Auerbacher and Henrietta Grom were married in 1925. He had two sons, Louis Jr. and George, and she had one son, John Grom, by a former marriage. At the time of the marriage, Louis J. Auerbacher was an officer and employee of the Borden Company. He continued in that employment till late in 1939, when he retired and moved from his home in New Jersey to St. Petersburg, Florida, where he claimed his domicile and lived until his death in February 1946.
January 9, 1945, Louis J. Auerbacher executed his will. It was said to be a revision of a previous will, but the former will appears to have vanished, as no one could produce it at the trial of this case. After providing for the payment of debts, funeral expenses, taxes and administration expenses, the will disposed of certain personal effects and created a trust estate designating appellant and the Florida National Bank of Jacksonville as trustees. The trustees were given power to control, encumber, invest, sell or otherwise dispose of the trust property, including the income therefrom and were required to pay the widow, Henrietta Auerbacher, $8,000 per annum during her natural life. If the income from the estate did not produce this much, the trustees were directed to encroach on the corpus to provide the balance. At the death of appellant, the trust was terminated and any balance remaining in the trust estate was to be divided equally among the two sons of the testator and John Grom, his step son. The will was probated in due course.
In September 1946, Louis J. Auerbacher, Jr., instituted this proceeding to revoke the probate of his father's will. There was a motion to dismiss and an answer to the petition. The motion was overruled, much evidence was taken on the issues made by the answer, arguments were heard, and the probate Judge revoked the probate of the will and decreed it to be invalid. The order of the probate court was, on appeal, affirmed by the Circuit Court. The latter order is here on appeal for review.
The probate court held the will invalid for two reasons. (1) Lack of testamentary capacity on the part of the testator, and (2) it was procured through undue influence. Since the Circuit Court affirmed this judgment, the essential question to be answered here is whether or not the evidence supports the judgment and finding of the probate court. There is some suggestion that the probate Judge placed the wrong interpretation on the evidence, but we do not think there is any merit to this contention and do not discuss it.
The records and the briefs cover approximately 2,000 pages and there are conflicts in the evidence which we do not discuss. We will point out and discuss a few salient points on which the probate judge apparently based his judgment. To discuss the evidence as a whole would require a long opinion that would serve no useful purpose. We find a perfectly logical basis for the probate Judge's finding and judgment and will direct what we have to say to that.
The evidence shows that the testator had been suffering from progressive cerebral arteriosclerosis for several years, that senile dementia with a paranoid trend was superimposed on his primary trouble, that he became very ill in March 1944 and had a complete mental and nervous breakdown in August following. He was placed in the Hospital where he remained till September, then he was transferred to Appalachian Hall in Asheville, a sanitarium for the treatment of mental and nervous diseases. He was later transferred to *Page 661 
Meister's Rest Home in St. Petersburg, where he remained till November 6, 1944, during all of which time he was not only suffering physically, he was disorientated and melancholic.
The will was drawn by a very reputable attorney of St. Petersburg, it was executed in his presence and in the presence of Miss Helen Andrews, his legal secretary, and Mary E. Arnold, a nurse. All these witnesses, including Dr. H.W. Wade, the family physician testified that in their judgment the testator was competent to make a will. The evidence of these witnesses, the sanctity clothing the execution of a will and the reluctance of courts to set them aside, is the primary reliance of appellants to reverse the judgment appealed from. Other evidence, not so direct, supports appellant's contention but the probate court discarded this evidence and decided the case on another theory, and we find ample support for his judgment.
Now let us examine the other side of the picture. It is shown that the disease with which the testator was afflicted was progressive, that he grew gradually worse from the time he took it and that he was at no time normal, mentally or physically, from the time of his breakdown in August 1944 to the time of his death in 1946. The probate Judge found that during this period the testator was "so weak from his progressive affliction, coupled with the medical treatment he was obliged to take to ease his pain and suffering, that his reactions and mental processes were materially affected. He was inordinately disturbed by the strained relations between his wife and his sons. On slight provocation he became intensely emotional and displayed unreasonable resentment at things which formerly he would have brushed aside. He could not evaluate situations and his reactions to persons and conditions became variable and inconsistent with his normal thinking. His state of mind became definitely senile with that peculiar and pathetic senility wherein one is easily prevailed upon to turn against loved ones, particularly those who are absent, even though such absence may be unavoidable or reasonably explained."
There is ample evidence in the record to support this finding and the will was executed during the period the finding described. There is evidence to show that almost from the beginning of their married life, appellant continuously turned on the "heat" to alienate the testator against the members of his family. She was rude to his sons and their families when they visited their father, she repeatedly withheld his mail and kept it from him, she demanded that the testator have his sister return a cameo brooch which he had given her, the controversy about this resulted in a family row and the testator's relations with his family became so tense that he quit contributing to the support of his mother; the Auerbacher family dinners at Christmas, a practice of years standing, were discontinued, and were never renewed. In addition to this, there was a studied effort on the part of appellant to substitute her son John Grom in the affections of the testator, in place of his sons Louis Jr. and George.
John Grom had an ambassador in the home looking after his interest while Louis Jr. and George lived in New Jersey and rarely visited their father. It is not an unwarranted presumption that appellant's rudeness to them had something to do with this. The evidence shows that she was the type that would impose her will on the testator and that she had ample opportunity to do so. It also shows the testator made his will when he was in a weakened and depleted condition mentally and physically, that it was to her decided advantage and that it was made after he had been induced to turn against his family, which he is shown to have thought very highly of before he became mentally deranged. There is nothing more flexible than a sick mind. When that is present and the instrument eager to manipulate it, with the opportunity to do so present, and it is bent to her liking, the burden is on her to prove that she had no part in the bending.
Such is the picture that a fair appraisal of the record makes, and being so, it becomes unnecessary to discuss the question of fraud and the distinction between fraud *Page 662 
and undue influence, or to point out specific acts showing, or tending to show, undue influence. The probate judge had the parties before him, he heard the evidence, and when one gets through reading the record, he has a definite conviction that the will was procured through undue influence.
Affirmed.
ADAMS, C.J., and CHAPMAN and THOMAS, JJ., concur.