147 So.2d 613 (1962)
In re ESTATE of Helen Page WINSLOW, Deceased.
Cathryn L. LOWN, Appellant,
v.
Charlotte B. PATTERSON, Appellee.
No. 3067.
District Court of Appeal of Florida. Second District.
December 5, 1962.
Rehearing Denied December 31, 1962.
David R. Lowell and Bailey M. Welden, St. Petersburg, for appellant.
William E. Allison of Harris & Allison, St. Petersburg, for appellee.
WHITE, Judge.
Cathryn L. Lown seeks reversal of an order denying her petition for probate of a purported last will and codicil of Helen Page Winslow dated respectively July 24, 1956 and April 8, 1959. The probate judge found that the will and codicil were the products of undue influence exerted by Cathryn L. Lown who had served as nurse and companion to Helen Winslow and who was named as sole beneficiary and executrix of the disputed will. Contestant Charlotte B. Patterson, the appellee herein, is the surviving niece and closest blood relative of Helen Winslow. The proponent, Cathryn Lown, was not related to the decedent.
The probate judge found and held that:
"1. The decedent, Helen Page Winslow, was 90 years of age at the time of her death, November 5, 1960, and that she had resided in Pinellas County, Florida, for ten years.
"2. That on February 11, 1959, an inquisition of incompetency of Helen Winslow was filed with this Court and she was thereafter examined by the Court-appointed committee, both doctors of said committee being reputable psychiatrists who determined that she *614 was incompetent by reason of `physical incapacity due to deafness and blindness and generalized arteriosclerosis changes'; that the committee findings were contested by the then alleged incompetent and testimony was taken from expert and lay witnesses and exhibits were admitted and the Court considered the fact that Helen Winslow was comfortable and physically well cared for by Cathryn Lown, whereupon by order of this Court, dated March 25, 1959, Helen Winslow was found to be not incompetent but, due to her advanced age and physical condition, susceptible to the influence and direction of those close to her; that other findings of fact were set forth in said order.
"3. That Helen Winslow voluntarily moved in with Cathryn L. Lown during the year 1954 and thereafter remained with her almost continuously until Mrs. Winslow's death in November, 1960; that during said six year period, due to Helen Winslow's advanced age, deafness and poor eyesight, she depended entirely upon Cathryn Lown for her daily care and physical needs; that, in addition, Cathryn Lown offered Mrs. Winslow spiritual guidance which was accepted by her as proved by her gifts to various `ministers' and the terms of her codicil wherein she named Oral Roberts, Inc., as sole beneficiary of her estate in the event that Cathryn Lown should predecease her.
"4. That Cathryn Lown admittedly assisted Mrs. Winslow in effecting the transfer of all of Mrs. Winslow's stocks to her and Cathryn Lown jointly with right of survivorship, which occurred within the year after Mrs. Winslow moved in with Cathryn Lown; that Cathryn Lown furthermore took an active part in effecting the execution of Helen Winslow's will and codicil, which are presently in dispute, and also in having herself appointed with power of attorney for Mrs. Winslow in the year 1955.
"5. That the last will executed by Helen Winslow prior to the will and codicil in issue was dated November 16, 1950, wherein Helen Winslow left her entire estate to two relatives or their issue; that Cathryn Lown stated that Helen Winslow disinherited these relatives, who were Charlotte B. Patterson, her niece, and Maude Winslow Nichols, her sister-in-law, due to the misconduct of the contestant herein, Charlotte B. Patterson, in the treatment of her mother and the administration of her mother's estate. However, this Court finds that most of the alleged misconduct by Charlotte B. Patterson was a conclusion drawn by Cathryn Lown, which was improperly conveyed to Helen Winslow, whereby Helen Winslow did not have a true basis to not only disinherit Charlotte B. Patterson but also a sister-in-law, Mrs. Nichols, against whom there were no thoughts or suggestions of misconduct. Cathryn Lown admitted that at the time she was `telling her (Helen Winslow) God's word,' she also told Helen Winslow that Charlotte B. Patterson had ridiculed Cathryn Lown's knowledge of the Bible or her religion, which was unfounded, indefensible and certainly prejudicial to Charlotte Patterson.
"6. That due to both parties having waived the limitations imposed by the so-called Dead Man's Statute, this Court was offered extensive testimony by both parties which would have otherwise been omitted and, in addition, this Court has been well aided by examination of the correspondence received into evidence, which were letters from and to the parties and the decedent during the time that the parties first knew one another, the development of Helen Winslow's reliance upon Cathryn Lown and Cathryn Lown's dominance of Helen Winslow. As *615 early as June 2, 1954, Helen Winslow, by her own hand, stated in a letter to Charlotte Patterson, `I am so glad you and Mary are coming down. I should love to go to lunch with you. I don't suppose Cathryn would want me to and would probably be awfully disagreeable about it  but we will see  I want you to know that I should like to. * * *'
"7. That this Court having allowed wide latitude in the admission of testimony and exhibits, the Court was especially cautious to examine the conduct and attitude of the witnesses and noted that the proponent, Cathryn Lown, did not or would not make full disclosure even when examined by the Court itself; that when questioned regarding a $15,000.00 cash withdrawal from a bank account by Helen Winslow, although Cathryn Lown admitted the immediate receipt of $5,000.00 in a lump sum, her only explanation of the use of the remaining $10,000.00 during a twenty month period of time was that Helen Winslow wore a money belt and contained it there, although she was under Cathryn Lown's daily observation and depended upon her continuous physical control.
"Based upon these findings, this Court concludes that Helen Winslow, from the year 1954 until the time of her death, did not possess a free mind whereby she could intelligently and voluntarily dispose of her property but that she was so dominated and controlled by the proponent, Cathryn Lown, that Helen Winslow's acts of disposing of her entire assets by transfer, execution of power of attorney, execution of will and codicil, were not her own free acts but merely the execution of Cathryn Lown's own will power over her.
"IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that the instrument dated July 24, 1956, and codicil thereto, dated April 8, 1959, are invalid in their entirety and do not constitute the will of Helen Winslow."
Supplementing the findings set forth in the recited order, it appears that for three and a half years Cathryn Lown had been practical nurse and housekeeper for Mary Page Adams, sister of Helen Winslow, prior to the time that Helen Winslow moved to Florida in 1950. Cathryn Lown met Helen Winslow in St. Petersburg while the latter was visiting her sister who died in 1952. Two years later, at the age of 84, Helen Winslow moved into a house occupied by Cathryn Lown and she thereafter purchased a home for Cathryn Lown in St. Petersburg.
It was approximately six months after Helen Winslow moved in with Cathryn Lown that the name of Cathryn Lown was placed on all the stocks, bank accounts and other properties of Helen Winslow with right of survivorship. The safety deposit box of Helen Winslow was also placed jointly in the name of Helen Winslow and Cathryn Lown. The following year, 1955, Cathryn Lown received a power of attorney from Helen Winslow giving Cathryn Lown complete control of the Helen Winslow properties. It was asserted on behalf of contestant Charlotte Patterson, and denied by Cathryn Lown, that the foregoing steps were taken without the knowledge of Helen Winslow's relatives.
On July 13, 1956, Helen Winslow was visited by her niece and grandniece and, according to testimony, everything was as it always had been. They embraced and engaged in amiable conversation. Two weeks later Helen Winslow executed the will here in dispute omitting previous bequests to her niece and sister-in-law to whom for over ten years she had been sending monthly support checks. On August 21, 1956, Cathryn Lown wrote the sister-in-law that Helen Winslow was cutting off all further support checks.
*616 Letters in evidence reflect the warm affection of Helen Winslow toward her niece Charlotte Patterson. There was considerable correspondence between them until approximately the time of the execution of the new will in July 1956. Thereafter Charlotte Patterson's letters to her aunt were returned by Cathryn Lown who insisted that the letters upset Helen Winslow and that it was not good for her to have them. Cathryn also informed Charlotte Patterson that her aunt no longer wanted to see her. This was about the same time that Helen Winslow's sister-in-law was informed by Cathryn Lown that she would no longer receive the support payments.
Preliminary to the foregoing incidents, on June 2, 1954, Helen Winslow wrote to Charlotte Patterson in part as follows:
"Dear Charlotte,
I am so glad you and Mary are coming down. I should love to go to lunch with you  I don't suppose Cathryn would want me to and would probably be awfully disagreeable about it, but I will see  I want you to know that I should like to. * * *
 [Signed] Aunt Helen."
(Emphasis added)
Previously, on March 20, 1954, Helen Winslow had written in part as follows:
"Charlotte dear,
Of course I want you to come down here whenever you can. * * * Don't write Cathryn  it gets her so upset  as you know she is very excitable and imagines all sorts of things. * * *
 Much love, etc.
 [Signed] Aunt Helen."
Letters from Helen Winslow to Charlotte Patterson during July and August 1955 disclose that Cathryn Lown was temporarily in a rest home. In these letters Helen Winslow repeatedly requested her niece to come down and visit her. The letters were very affectionate. In chronological order the next letters in the record were written by Cathryn Lown to Charlotte Patterson. On January 11, 1956, Cathryn Lown began to write Charlotte Patterson advising her not to write to her aunt, not to visit her and to mind her own business, and that since the death of Mary Page Adams, Helen Winslow's sister and Charlotte's mother, she (Charlotte) would get all the estate under Helen Winslow's will. Six months thereafter, however, Helen Winslow executed the will here involved leaving her entire estate to Cathryn Lown.
The able probate judge obviously was convinced by these incidents, and by a welter of other evidentiary circumstances, that Cathryn Lown deliberately planned to insulate Helen Winslow from her relatives and to prejudice her against them, particularly Charlotte Patterson, to the end that she, Cathryn Lown, could dominate Helen Winslow and control the disposition of her estate  and that Cathryn Lown was successful in these endeavors. These conclusions are fortified by reference to the chronology of some of the exhibits in evidence to which we have previously referred. It was on March 24, 1955, that Helen Winslow executed the general and special power of attorney giving Cathryn Lown joint control of her bank account. It was in August 1956 that Cathryn Lown, having knowledge of the earlier will as evidenced by her letters and having knowledge of her joint tenancy and of the recent will of July 1956 leaving everything to her, wrote to Helen Winslow's sister-in-law advising her that Helen Winslow was no longer financially able to send her the monthly support checks since her resources were limited to $200.00 old age insurance. This was untrue.
Cathryn Lown, as stated, knew that the joint survivorship accounts with reference to Helen Winslow's assets had been established; but the support payments to the sister-in-law would, of course, operate to diminish the estate which presumably would pass to her, Cathryn Lown, on Helen Winslow's death. Further indicating assets other than old age insurance is the fact that *617 later, in March 1959, a Helen Winslow check in the sum of $15,000.00 made out to "cash" was cleared through Union Trust Company of St. Petersburg. The record shows, as pointed out by the probate judge, that Cathryn Lown could not account for $10,000.00 of this amount. We observe at this juncture that the codicil of April 8th, 1959, named Oral Roberts, Inc. contingent beneficiary in the event Cathryn Lown predeceased the testatrix. Thus the sole heir and previously named beneficiaries of Helen Winslow would be totally excluded.
Cathryn Lown testified that visits of Charlotte Patterson had an adverse effect on Helen Winslow and that as a result of such a visit in July 1956 Helen Winslow suffered paralysis of the tongue and was treated by a Dr. Overbey. Dr. Overbey testified, however, that he had never seen Helen Winslow prior to January 1959 and had never treated her for paralysis of the tongue. Other testimony and letters of Cathryn Lown disclose additional contradictions and prevarications.
On February 11, 1959, proceedings were instituted to inquire into the competency vel non of Helen Winslow. The proceedings were instituted by her grandniece, Charlotte Patterson's daughter, after Cathryn Lown had refused to let her see her aunt. After receiving somewhat conflicting views of four medical witnesses, the court adjudged Helen Winslow not legally incompetent. The court's order, however, included a finding that Helen Winslow was susceptible to the influence and direction of those "close to her" but that no question of undue influence or fraud was being considered by the court at that time.
There were the usual conflicts and disputations which the probate judge resolved in favor of the contestant. Testimony on behalf of the proponent was directed largely to the proposition that Helen Winslow was fully capable of forming her own opinion and executing a valid will; and stemming arguendo from that premise is the implication that her testamentary capacity was so pronounced as to negate undue influence. It is also urged that the will was not unnatural or unreasonable under all the circumstances; and truly the record does indicate in this connection that Helen Winslow was by no means physically or materially neglected by the proponent.
Implicit in the probate judge's order denying probate of the disputed will is a finding that Cathryn Lown was the active and dominant personality in the various transactions by which she acquired control and apparent ownership of Helen Winslow's estate; and that Cathryn Lown, by improper means, substituted her own will for that of Helen Winslow. The question is whether or not there was substantial competent evidence to support these conclusions. In re Reid's Estate, Fla.App. 1962, 138 So.2d 342, 347; In re Zimmerman's Estate, Fla. 1956, 84 So.2d 560, 561; In re Mesker's Estate, 1946, 158 Fla. 180, 28 So.2d 260. We stress in this connection that the findings of the probate judge are given the same weight on appeal as the findings of any other trier of fact. Pancoast v. Pancoast, Fla.App. 1958, 107 So.2d 787.
It is unnecessary in this opinion to cite copious decisions on undue influence in the law of wills or to discuss the prime burden of proof or the burden of going forward with evidence at certain stages of contest litigation. We would refer, however, to In re Reid's Estate, supra; In re Palmer's Estate, Fla. 1950, 48 So.2d 732; In re Auerbacher's Estate, Fla. 1949, 41 So.2d 659; and to the broad definitive statement of the doctrine of undue influence in 1 Page on Wills, Lifetime Ed., § 184:
"The theory which underlies the doctrine of undue influence is that testator is induced by various means, to execute an instrument which, although his, in outward form, is in reality not his will, but the will of another person which is substituted for that of testator. Such an instrument is, in legal effect, not a will at all. Although executed by testator, his intention to make a will is so *618 defective that the instrument is invalid."
The central problem in the trial of a case such as this is not merely the matter of ascertaining the law. The real problem at the trial level is the ascertainment of the facts and the application of well defined rules of law to the facts so ascertained; and the conclusion of the probate judge will not be disturbed on appeal unless there was palpable misconception of the facts or manifest misapprehension or misapplication of the law. On the record in this case we perceive no such error.
Affirmed.
SHANNON, C.J., and ALLEN, J., concur.