# Third District Court of Appeal

## State of Florida

Opinion filed October 13, 2021.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D20-1500
Lower Tribunal No. 15-42-P
_____

**Diane Swiss**,
Appellant,

vs.

**Alexis Flanagan**,
Appellee.

An appeal from the Circuit Court for Monroe County, Luis Garcia, Judge.

Saltiel Law Group, and Matthew Carcano, and Moises A. Saltiel, for appellant.

Hershoff, Lupino, & Yagel LLP, and Robert C. Stober, for appellee.

Before SCALES, HENDON, and MILLER, JJ.

MILLER, J.

Appellant, Diane Swiss, challenges a final judgment invalidating the last will and testament executed by the testator, William D. Hadash, approximately a year and half before his death. The trial court found the will was tainted by undue influence. On appeal, Swiss contends the findings below are factually and legally unsupported. Relying upon the seminal Florida Supreme Court decision of In re Estate of Carpenter, 253 So. 2d 697 (Fla. 1971), and its progeny, we affirm the well-reasoned order under review.

## BACKGROUND

The testator, a successful businessman during his youth, died at the age of seventy-seven. He was survived by his three adult children and Swiss, his long-time companion. After his death, Swiss filed a petition for formal administration of the disputed will, which bore an execution date of June 12, 2013. By the terms, Swiss was to receive virtually the entire estate, which consisted nearly exclusively of real estate holdings. In all previously drafted estate planning documents, the testator had provided for each of his three children, along with Swiss. And, in the years preceding his death, he had expressed an intent to reduce Swiss's inheritance.

Appellee, Alexis Flanagan, the testator's youngest daughter, filed a caveat to the petition asserting undue influence, along with a counter-petition for administration. In her counterpetition, she sought to probate a document

2

entitled "Last Will and Testament," dated September 18, 2001. After the pleadings closed, the action proceeded to trial. The parties presented conflicting evidence, and most credibility conflicts were resolved by the trial court against Swiss.

The record reflects that over the years, the testator met with four separate attorneys regarding his estate plans. The first such meeting occurred in 2001, when he executed the "Last Will and Testament" under the supervision of his long-standing estate attorney. Under the terms of that particular will, he devised an out-of-state condominium to Swiss and a Florida property to the children. He also granted Swiss and Flanagan dual power of attorney by means of a separate document.

After learning of the specifics of the power of attorney, Swiss contacted the testator's estate attorney. She informed him the testator had lied to her, and she had concerns regarding serving as a co-agent with Flanagan. She described their relationship as acrimonious and indicated the testator would revise the terms of the will.

In 2007, the testator returned to his estate lawyer to request a will revision. At his direction, the attorney prepared a draft reflecting a $500,000.00 bequest to Swiss, if she survived him, and dividing the remaining assets among the children. Flanagan was named as executor,

3

and Swiss would play no formal role in the administration. The will was never executed.

Two years later, the testator again returned to his estate attorney, this time for the purpose of directing the preparation of a will reducing Swiss's share to a life estate in the out-of-state property and $100,000.00 bequest. The remaining estate was to be divided equally among the children. The testator's son was named executor, while his daughters were appointed as co-trustees. Once again, Swiss would be uninvolved in the administration. Like the prior version, the will was left unexecuted.

Approximately three years later, accompanied by Swiss, the testator again met with his estate attorney for the purpose of revising his will. The testator appeared to be in deteriorating health. After discovering the testator inexplicably intended to disinherit his children and devise his entire estate to Swiss, the attorney deviated from his standard practice and requested two competency evaluations. The testator later provided the attorney with a report confirming he was able to render health and welfare decisions. The report, however, was silent as to his capabilities relating to financial transactions. The attorney refused to draft the requested document, instead referring him to a second attorney.

The testator then met with the referral attorney and requested the preparation of further document drafts.  The documents were provided, and Swiss faxed a copy, along with proposed edits, to yet a third attorney.  The testator purportedly destroyed the drafts, and no further action was taken until the following year.

In 2012, the testator selected a fourth attorney from a list of names supplied by Swiss.  An initial meeting was had, but, shortly thereafter, the testator fell and fractured his hip.  This precipitated surgery, followed by a lengthy convalescence in a post-surgical rehabilitation facility.  While in recovery, the testator was uncooperative, belligerent, and exhibited signs and symptoms associated with an altered mental status.  Nonetheless, the fourth attorney conducted a second meeting at the rehabilitation facility.

Correspondence from that time reflects the testator was not properly monitoring his finances and could not adequately care for himself.  Swiss completed insurance forms and other documents on his behalf, while, at times, representing she was his wife, and managed his affairs.  She also discussed the nature of his assets with others and curtailed communication with his children.

Within days of his release from the rehabilitation facility, the testator again met with the fourth attorney, this time at Swiss's home, for the purpose

5

of completing revised estate documents. By that time, he was nonambulatory and incontinent.

Under the terms of the revised will, Swiss was to be the sole beneficiary of all assets, save a $5,000.00 bequest to the testator's eldest daughter. She was further named personal representative and granted authority to render end-of-life decisions. Two witnesses were secured by the attorney. Despite Florida residency, the will reflected the testator lived out-of-state. This subjected the estate unnecessarily to a steep inheritance tax. A contemporaneously executed affidavit contained multiple discrepancies, including denominating the testator a widower rather than a divorcé and mischaracterizing his eldest daughter as his youngest.

The week after the will was executed, the testator was diagnosed with dementia, anxiety, and depression. A subsequent fall resulted in further medical complications, and a routine scan revealed a history of cerebral infarctions. Later acquired medical records were replete with observations regarding his impaired cognitive abilities. The testator's health continued to degenerate, and he did not execute any further estate documents before his death.

At the conclusion of the evidentiary presentation, the lower tribunal concluded the 2013 will was the product of undue influence. The court

admitted the 2001 "Last Will and Testament" to probate, and the instant appeal ensued.

## STANDARD OF REVIEW

"We review de novo the legal question related to section 733.107(2), and we review the trial court's factual findings for competent substantial evidence." Hannibal v. Navarro, 317 So. 3d 1179, 1181 (Fla. 3d DCA 2021); see In re Est. of Murphy, 184 So. 3d 1221, 1227 (Fla. 2d DCA 2016) (providing that the application of an evidentiary presumption is subject to a de novo standard of review); Estate of Madrigal v. Madrigal, 22 So. 3d 828, 829 (Fla. 3d DCA 2009) (noting that affirmance was warranted where the trial court's findings of fact were supported by competent, substantial evidence and the findings of fact support the trial court's determination of undue influence). In this vein, "our scope of review requires us to accept the factual findings of the trial court so long as there is support for them by competent substantial evidence." Estate of Brock v. Brock, 692 So. 2d 907, 913 (Fla. 1st DCA 1996).

## LEGAL ANALYSIS

Under Florida law, "[a] will is void if the execution is procured by . . . undue influence." § 732.5165, Fla. Stat. (2021). The burden of establishing undue influence lies with the party seeking to invalidate the will. See §

7

733.107, Fla. Stat. As this court has previously explained, to constitute undue influence, "the influence must amount to over persuasion, duress, force, coercion, or artful or fraudulent contrivances to such an extent that there is a destruction of free agency and willpower of the testator." Raimi v. Furlong, 702 So. 2d 1273, 1287 (Fla. 3d DCA 1997).

In the Carpenter case, the Florida Supreme Court determined that a rebuttable presumption of undue influence can arise where a substantial beneficiary, occupying a confidential relationship with the testator, is shown to have actively procured the will. 253 So. 2d at 701. The court advanced several criteria to consider in determining whether active procurement exists. These criteria include: (a) whether the beneficiary was present at the execution of the will; (b) whether the beneficiary was present when the testator expressed a desire to make a will; (c) whether the beneficiary recommended an attorney to draft the will; (d) whether the beneficiary knew of the contents of the will prior to execution; (e) whether the beneficiary gave instructions on preparation of the will to the attorney; (f) whether the beneficiary secured witnesses to the will; and (g) whether the beneficiary possessed the will subsequent to execution. Id. at 702.

Where such a presumption arises, the burden then shifts to the beneficiary to come forward with a reasonable explanation as to his or her

8

active role in the affairs of the testator.  <u>Id.</u> at 704.  Once that burden is met, the presumption vanishes, and the trial court decides the case in accord with the greater weight of the evidence.  <u>Id.</u>

Applying these principles to the instant case, Swiss concedes she shared a confidential relationship with the testator.  Because she stood to inherit nearly the entire estate and her share of the estate markedly increased by the terms of the disputed will, we further conclude she was a substantial beneficiary.  Thus, we focus our analysis on whether the record supports the finding of active procurement.

Here, the record adduced below amply supports the conclusion Swiss was actively involved in the testator's estate planning as early as 2001, arranged legal appointments, accompanied him to multiple law offices, compiled a list of recommended attorneys, contacted attorneys directly, faxed edited estate documents to a lawyer, and possessed familiarity with the contents of the estate documents.  These facts satisfy most of the <u>Carpenter</u> criteria.

Further, as has been observed by multiple courts, the <u>Carpenter</u> criteria are not exclusive.  Instead, courts "may expect supplementation by other relevant considerations appearing in subsequent cases."  <u>Id.</u>; <u>see also</u> <u>In re Est. of Winslow v. Patterson</u>, 147 So. 2d 613, 616 (Fla. 2d DCA 1962)

(considering the insulation of the testator from her relatives and efforts to prejudice her against them); <u>Newman v. Smith</u>, 82 So. 236, 246 (Fla. 1918) (considering the reasonableness of the will provisions). In this regard, courts have routinely considered the mental and physical health inequalities between the testator and beneficiary at the time the will is executed. <u>See</u> <u>In re Estate of Reid</u>, 138 So. 2d 342, 349 (Fla. 3d DCA 1962), <u>overruled in part on other grounds</u>, <u>Carpenter</u>, 253 So. 2d 697 (Fla. 1971); <u>Cripe v. Atl. First Nat'l Bank of Daytona Beach</u>, 422 So. 2d 820, 824 (Fla. 1982) ("Where there is such inequality of mental strength, active procurement can be shown by evidence . . . of a request or suggestion by the dominant party.").

As relevant here, it can scarcely be the subject of debate that in the months preceding the execution of the disputed will, the testator was in declining health. Indeed, his frailties were sufficiently concerning to warrant a request for competency evaluations by his long-serving estate planning attorney. Further, by the time the will was drafted and executed, Swiss, who was able-bodied and mentally firm, had assumed control over the testator's finances and other aspects of his personal affairs, restricted lines of communication with his children, and disclosed his financial holdings to others.

Perhaps of equal import, as astutely noted by the trial court, "[t]he circumstances [of the will] are highly suspicious, including the absence of a documented attorney's file for the estate preparation . . . the clear involvement of . . . Swiss in contacting the lawyer and arranging the meeting, [and] the errors in the will and affidavit." The preparing attorney was unable to recount the time, place, and manner of signature of the will, and his record was devoid of standard documentation, including invoices, drafts, correspondence, and the like. Further, prior will drafts reflected Swiss was to take no active role in administration, but in the disputed will, she was nominated personal representative.

We conclude these circumstances, coupled with the provisions of the will, were more than sufficient to give rise to a rebuttable presumption of undue influence. See In re Burton's Est., 45 So. 2d 873, 875 (Fla. 1950) (quoting Gardiner v. Goertner, 149 So. 186, 190 (Fla. 1932)) ("Undue influence is not usually exercised openly in the presence of others, so that it may be directly proved, hence it may be proved by indirect evidence of facts and circumstances from which it may be inferred."); Steven G. Nilsson, Florida's New Statutory Presumption of Undue Influence: Does It Change the Law or Merely Clarify?, 77 Fla. B.J. 20, 24 (2003) ("Undue influence is rarely susceptible of direct proof because of secret or private dealings

11

between the decedent and the alleged wrongdoer; the latter typically testifies that he did nothing wrong, and the decedent never testifies to the contrary.").

Although Swiss presented an explanation as to her actions, the trial court found her testimony unpersuasive. "[I]t is not within our province to decide which of the witnesses gave the more exact or truthful testimony . . . the weight to be given to the testimony of each of the witnesses and the credibility to be attached thereto, is clearly within the sound discretion of the [trial court]." Reid, 138 So. 2d at 347. Accordingly, we decline the invitation to reweigh the testimony, and instead conclude the order below is well-supported by both guiding principles and competent, substantial evidence.

Affirmed.