WALDEN, Judge.
The County Judges’ Court revoked the probate of a will based upon its finding that the decedent lacked testamentary capacity. We reverse.
Following familiar pattern, it will be our purpose to state the critical and dispositive question and outline the salient facts, the law appertaining, our reasoning and conclusions, and finally our appellate decision.
Did John F. Weihe possess testamentary capacity at the time he executed his will on September 24, 1965? (The other appellate questions are without merit and do not require discussion.)
Weihe died in 1968 at the age of 85 years. His will was admitted to probate in March 1970. He left his estate predominantly to six charities. These six charities, appellants here, moved for distribution of the estate. The probate court denied their petition and granted an extension of time for filing a petition for revocation of the will.
Weihe’s two children, Roy Weihe and Beatrice Chiniquy, from whom he had been estranged since he and his wife were divorced in 1929, filed a petition to revoke the will. The petition was granted on the grounds that decedent lacked testamentary capacity at the time the will was executed in 1965. The charities appeal the order setting aside Weihe’s will.
The decedent imbibed alcoholic beverages for a number of years and had arteriosclerosis at the time of his death. In 1966, after the will was executed, he suffered from a stroke. The evidence showed Weihe had certain peculiar traits; for instance, he dressed sloppily, kept a messy apartment and was known to urinate in his yard. His children questioned his testamentary capacity based on these factors.
All that need be proved to establish sound mind is that the testator, at the time he executed the will, knew the objects of his bounty, understood, in a general way, the nature and extent of his property and had a general understanding of the practical effect of the will as executed. Hamilton v. Morgan, 1927, 93 Fla. 311, 112 So. 80. A testator may still have testamentary capacity to execute a valid will even though he may frequently be intoxicated, use narcotics, have an enfeebled mind, failing memory, vacillating judgment. In re Estate of Dunson, Fla.App. 1962, 141 So.2d 601; In re Estate of Bailey, Fla.App. 1960, 122 So.2d 243. A will may even be executed by one who is insane or exhibits “queer conduct,” so long as it is done during a lucid interval. In re Carnegie’s Estate, 1943, 153 Fla. 7, 13 So.2d 299. The important requirement is that the testator possess the necessary qualities for testamentary capacity at the time of the execution of the will. Hamilton v. Morgan, supra.
*449 Appellate courts will not interfere with probate court findings of testamentary capacity unless there is an absence of substantial competent evidence to support its finding or unless it appears that the probate court misapprehended the legal effect of the evidence as a whole. In re Estate of Coles, Fla.App.1968, 205 So.2d 554. In this instance, we believe the probate court did misapprehend the legal effect of the evidence as a whole and must therefore be reversed. For an instance where the probate judge correctly denied probate and properly interpreted the legal effect of the evidence as a whole, see In re Estate of Zimmerman, Fla.1956, 84 So.2d 560.
The burden of proving lack of testamentary capacity is on the person seeking revocation of probate. In re Estate of Witt, Fla.App. 1962, 139 So.2d 904. We have examined with care the voluminous record in this case. Numerous witnesses testified presenting testimony both in support of and against Weihe’s capacities. Although the evidence was conflicting, we do not think it sufficient, as a whole, to prove lack of testamentary capacity.
To simplify matters, we will first discuss testimony supporting decedent’s testamentary capacity. Dr. O. L. Kelley, the decedent’s family physician, who had known and treated the decedent since 1963 and frequently made house calls on him, was deposed. In 1966, at decedent’s request, some four months after the will in question was executed, Dr. Kelley examined him to determine his capacity to sign a legal document. Dr. Kelley opined at the time he examined the decedent in 1966 Weihe was “. . .in complete contact with his surroundings, and mentally capable of signing legal documents, including a will.” Dr. Kelley also testified regarding decedent’s arteriosclerosis; he first made comment about it in his medical records in 1966 and considered it “average” for a man of Weihe’s age. Dr. Kelley felt that at all the times he saw decedent between 1963 and 1966, prior to his stroke, he was capable of “carrying on his usual business affairs, including drafting a will.”
Two attorneys who had had dealings with Weihe testified. John "Bollinger, the attorney who drafted the will in question and spent some twenty-two and one-half hours in conference with decedent, testified. Bollinger, an experienced attorney, had ample opportunity to observe Weihe’s speech and mannerisms around the time the will was executed and, based on his experience with decedent and observances of him, Bollinger thought Weihe had sufficient mental capacity to execute a will. Weihe first approached Bollinger concerning the will during the second or third week of August 1965. He visited Bollin-ger’s office on five separate occasions during the last few weeks of August and beginning of September 1965. Bollinger delivered the will to Weihe’s home on September 21, 1965. His legal secretary, who was present whenever Weihe came to the office and who went with her employer to Weihe’s house on September 21, 1965, also testified that Weihe was competent.
Charles Nugent, another lawyer, reviewed and discussed the will with Weihe on the date he executed it, September 24, 1965. He had no doubt that Weihe clearly understood the terms of the will and knew what he was doing when he executed it. Nugent discussed with Weihe the fact that he was specifically disinheriting his children. He stated that on the date the will was executed there was no question in his mind as to Weihe’s testamentary capacity.
Hugh Proctor, Weihe’s friend and a witness to the will, testified. He saw decedent at least weekly during the period the will was executed. Proctor stated that Weihe had not been drinking the morning he signed the will, that he spoke distinctly and there was nothing unusual about his appearance.
Weihe’s cousin also testified, stating Weihe seemed competent. Weihe’s stepdaughter by his second marriage, who saw *450 him “at least once a week” and ran many errands for him, thought Weihe competent to make a will in 1965.
Now, we will discuss the testimony supporting decedent’s incapacity. Several medical witnesses testified in an attempt to overcome the presumption of Weihe’s capacity. Dr. D. E. Patterson, who treated decedent from 1955 to 1957, almost ten years prior to the execution of the will, observed that when he last saw Weihe in 1957 he was sometimes irrational and suffered from loss of memory. Patterson had not treated Weihe after 1957 and did not examine him around the time this will was executed in 1965.
Dr. Raul Romaguera, a board certified pathologist, who performed an autopsy on decedent three years after the will was executed, testified that he found senile changes and hardening of the arteries in decedent’s brain. He further testified that decedent’s brain was actually decreased in size and weight. Dr. Romaguera stated that he thought the condition of hardening of the arteries in decedent’s brain had been going on for some time, probably five years. On cross examination he couldn’t be specific and admitted that the incapacity could have occurred two or eight years before death (June 1968) and that an intervening event (impliedly a stroke such as decedent suffered in 1966) could have accelerated the changes. Based solely on the autopsy, Dr. Romaguera, who was not acquainted with decedent, and who had not conferred with anyone who actually knew the decedent, stated that the changes in decedent’s brain would have severely impaired his intellect.
Dr. Jack Mickley, a board certified pathologist, testified after examining Dr. Ro-maguera’s autopsy report, that no one could give a valid opinion, based upon an autopsy report, as to what the mental condition of a person suffering from arteriosclerosis was at any time prior to the autopsy. He stated that one would have to witness the decedent’s actual behavior, not the things that are in his brain, in order to determine the effect of arteriosclerosis on an individual’s mentality. Dr. Mickley also discounted placing too much emphasis on the size of the brain, since “. . . size of brain has nothing to do with intelligence or nothing to do with behavior. Apes have bigger brains than we have.”
Dr. Clifford McIntyre, a non-board certified psychiatrist who also practices in the field of neurology, testified. He examined the autopsy report during the trial and based his opinion solely on the report made three years after the will was executed. He had never met the decedent and knew nothing about him. He expressed that decedent’s condition must have existed at least ten years prior to his death and that functioning of decedent’s brain was probably impaired due to a decrease in the size of the cortex. He is not a board certified pathologist and had only conducted five autopsies during his career, the last one in 1945.
Others testifying included casual neighbors, who commented on decedent’s sloppy mode of dress, messy apartment, drinking and habit of urinating in his yard. None of them specifically could state that Weihe was not lucid on the date the will was executed. Weihe’s daughter testified, but she had not seen him for four years prior to the time he executed the will; consequently her testimony is of no value in determining Weihe’s testamentary capacity. A real estate broker, who was the ex-wife of one of decedent’s friends, periodically helped him write checks and pay his bills because he was nearly blind. She had known him since 1955, but did not see him regularly. She thought he had poor business judgment and was incapable of handling his own affairs. A tenant of decedent’s, who met him one month before the will was executed, testified he drank “quite a bit of beer . . . and had very peculiar ways about him,” but did not comment specifically on Weihe’s behavior the date the will was executed.
*451 Evaluating the testimony, we find conflicts regarding decedent’s competency. This case is factually similar to Hamilton v. Morgan, supra. There the County Judge ruled that the decedent lacked the requisite testamentary capacity when he made his will. The Circuit Court’s reversal was affirmed by the Supreme Court, which stated:
“In this holding we are mindful of the rule approved by this court to the effect that the findings of fact by a probate judge upon conflicting evidence should, ordinarily, not be disturbed on appeal to the circuit court, where there is ample evidence to sustain the finding; yet, where the prohate judge misapprehended the legal effect of the evidence as an entirety, his finding should not be sits-tained merely because there is evidence that is contradicted, on which the finding may be predicated. Newman v. Smith [77 Fla. 633, 82 So. 236,] supra.
“We have examined the evidence carefully, and our conclusion is that on the issues made the probate judge misapprehended its legal effect. The decided weight of the evidence supports sanity at the time the will was executed. It is true, there was some evidence supporting mental and physical decline in the late years of the testator’s life, but none of it goes to the date of the execution of the will, and, as for the testimony of the experts, it was largely hypothetical, and while it was to the effect that pellagra and the long use of intoxicating liquors had a tendency to debilitate the mentality, it was also conclusive to the effect that the extent of debilitated mentality must be determined by an examination of the individual case, and no such examination and pronouncement was ever made on the testator.” 93 Fla. at 317-318, 112 So. at 82.
In re Starr’s Estate, 1935, 125 Fla. 536, 170 So. 620, reversed a probate court for having “misapprehended the legal effect of the evidence”. Although there was conflicting testimony, the Supreme Court found the testimony of the lawyer preparing the will and the witnesses to the execution of the will is entitled to “peculiar weight,” and the attending physician’s testimony is entitled to “great weight.”
Here two lawyers, both experienced and knowledgeable men, thought him to be competent without reservations; one three days prior to execution of the will and the other on the date of execution. His treating physician just four months after this will was executed signed a statement that Weihe was competent to execute legal documents. The expert medical witnesses who did testify had no personal knowledge of decedent and based their opinions solely on the autopsy conducted three years after decedent executed the will and after he suffered a seriously impairing stroke. The testimony of casual acquaintances that decedent was “peculiar” and an habitual drinker is not such as would render him incompetent. “Mere old age, physical frailty, sickness, failing memory, or vacillating judgment are not inconsistent with testamentary capacity if the testamentary prerequisites were possessed by the testator.” In re Estate of Dunson, Fla.App.1962, 141 So.2d 601, 604. Finally, we emphasize that the right to dispose of one’s property by will is highly valuable and it is the policy of the law to hold a will good wherever possible. In re Donnelly’s Estate, 1938, 137 Fla. 459, 188 So. 108.
Where the wills of elderly testators are challenged, the issue of testamentary capacity will often develop difficult characteristics. We all commonly know that old age tends to bring out eccentricities, memory lapses, and physical limitations. Thus, it would be unusual in such cases not to find the testimony conflicting, with some neighbors feeling that certain conduct is “odd” and others not. Further, in this area it appears that every acquaintance is competent and anxious to testify and opine one way and the other as to capacity and competency. These circumstances undoubtedly and understandably prompted the *452 promulgation of the appellate approach found in the key mentioned cases, whereby on appeal the conflicting evidence can be surveyed and a determination made as to whether the trial court misapprehended the legal effect of the evidence. Otherwise— if it were not so — the trial court decision, as a practical matter, would not be appeal-able.
Here, we have given the appealed decision all- due weight and reviewed back and forth the evidence. We think it most clearly evident that the testator at the time he made the will in question possessed testamentary capacity and that the able trial judge simply misapprehended the legal effect of the evidence as an entirety when he ruled to the contrary.
Feeling as a matter of fact and law that the decedent’s will of September 24, 1965, should be admitted to probate and his testamentary wishes thereby given effect, we reverse the appealed order and remand for further proceedings consistent herewith.
Reversed and remanded.
REED, C. J., and OWEN, J., concur.