702 So.2d 1273 (1997)
Manuel RAIMI, Individually and as Co-Personal Representative and Trustee of the Evelyn S. Gruber Last Will and Testament and Evelyn S. Gruber Revocable Trust Both Dated July 8, 1994; Renee Raimi and Frieda Pantzer, SunTrust f/k/a SunBank/Miami, N.A.; Theresa Heidel, Individually and as an Officer of SunBank/Miami, N.A., Lucille Clum, Individually and as Vice President and Trust Officer of SunBank/Miami, N.A.; Ida Raimi and Edward L. Schultz, Appellants,
v.
Estelle G. FURLONG, Appellee.
Nos. 96-954, 96-998, 96-1002, 96-1011 and 96-1012.
District Court of Appeal of Florida, Third District.
September 17, 1997.
Rehearing Denied January 8, 1998.
*1275 Bunnell, Woulfe, Kirschbaum, Keller & McIntyre, P.A. and Nancy W. Gregoire, Ft.Lauderdale, for appellants Manuel Raimi, Renee Raimi and Frieda Pantzer.
Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., and Arthur J. England, Jr., and Charles M. Auslander, and John G. Crabtree, Miami; Bergman and Jacobs, P.A. and Richard H. Bergman, Miami; Muskat, Odessky and Miller, P.A. and Robert B. Miller, North Miami Beach, for appellants SunBank/Miami, N.A., Theresa Heidel and Lucille Clum.
Deutsch & Blumberg, P.A. and James C. Blecke, Miami, for appellant Ida Raimi.
Holland & Knight, and Daniel S. Pearson, and Lenore C. Smith, Miami, for appellant Edward L. Schultz.
Heller and Kaplan, and Daniel Neal Heller, and Dwight Sullivan, and Joseph Currier Brock, Miami, for appellee.
Before LEVY, GERSTEN and GREEN, JJ.
GREEN, Judge.
This is a consolidated appeal of five appeals from an adverse final judgment entered after a non-jury equitable action and a will contest action. In its final judgment of the equitable action, the lower court, in essence, found that all of the appellants had conspired using undue influence to deprive the decedent (Evelyn S. Gruber) of her money and assets prior to her death in March 1995 and had caused her to execute her final will in their favor which they sought to admit to probate. As a result, the lower court awarded both compensatory and punitive damages against each of the appellants in the equitable action. Further, the court refused to admit the decedent's last will to probate in favor of an earlier executed will. The appellants argue, on this appeal, that the lower court's findings and conclusions are unsupported by competent substantial evidence in the record and/or the court misapprehended the effects of the evidence. We agree for the reasons which follow and reverse.

*1276 FACTUAL BACKGROUND

The undisputed evidence adduced at trial, taken in the light most favorable to appellee, reflects that prior to her death, the decedent, Evelyn Gruber, was the widow of Jacob Gruber. Evelyn and Jacob had been married for approximately 18 years when he died in March 1993. It had been a second marriage for both and had produced no children. Appellee, Estelle Furlong was Jacob's only child from his prior marriage and the decedent's stepdaughter. The decedent had no children of her own. Jacob and Evelyn had each amassed considerable wealth prior to their marriage to each other, Jacob as a successful New York attorney and investor and Evelyn as a buyer for a women's clothier. Evelyn's net worth, however, was considerably more than Jacob's.
Jacob's daughter, Estelle, a practicing probate attorney in Miami, rendered legal services to her father and stepmother, which included the drafting of their respective wills. Estelle's husband, Dr. James Furlong, was the personal physician to both Evelyn and Jacob. During their lifetime, Jacob and Evelyn interacted and socialized frequently with the Furlongs and bestowed generous gifts upon the Furlongs. Evelyn rarely saw or visited her blood family members which consisted of her sister, appellant, Ida Raimi and brother, appellant, Edward L. Schultz, both of whom resided in Michigan, or her nephew (i.e., Ida's son) and his wife, appellants, Manuel ("Manny") and Renee Raimi, who resided in St. Petersburg, Florida. Despite their lack of frequent interaction, however, Evelyn did generously bestow both monetary and non-monetary gifts upon her sister Ida due to her limited financial resources.[1]

A. "THE LOST WILL" DATED JANUARY 23, 1992
On January 23, 1992, Jacob and Evelyn executed identical wills which were prepared by Estelle Furlong. As for Jacob's will, the bulk of his estate, estimated as being between $1.5 and $1.8 million, was left to Evelyn. Estelle and Evelyn were named co-personal representatives of Jacob's estate. Evelyn's will similarly left the bulk of her estate, estimated at approximately $3.3 million to Jacob. Jacob and Estelle were named co-personal representatives of Evelyn's estate. In the event that Evelyn predeceased Jacob, it was provided that 75% of the residue of Evelyn's estate (as well as 100% of her jewelry, tangible property and $200,000) would go to Estelle Furlong and 25% of the residue would go to Evelyn's sister, Ida.[2] In the event that Ida predeceased Evelyn, a third of her $1 million share would go to appellant, Manny Raimi.
Shortly before Jacob's death in March of 1993, Evelyn asked Estelle for the original of her January 23, 1992 will. Estelle returned the original of Evelyn's will to her as requested and it was never seen again. This will, dubbed "The Lost Will" in the proceedings below, was the will ultimately admitted to probate by the lower court in the will contest action.

B. "THE BLAUSTEIN WILL" DATED APRIL 8, 1993
Approximately one week after the death of her husband Jacob, Evelyn had a friend, Rose Alpert, drive her to see Donna Blaustein, Esq., a probate attorney with the law firm of Broad and Cassel in Miami, for the purpose of procuring a new will. According to Ms. Blaustein's unrefuted testimony, Evelyn was anxious to have a new will drawn which would divide her estate equally between her sister, Ida and brother, Edward Schultz, and their heirs, and completely disinherit Estelle and Dr. Furlong. Although Ms. Blaustein had some initial concerns that Evelyn did not have a complete understanding of the size of Jacob's or her estate,[3] she *1277 deemed Evelyn competent to execute a new will and dispose of her estate. Ms. Blaustein explained that in her experience as a probate lawyer, it was not uncommon for elderly widows such as Evelyn not to fully comprehend probate matters.
Ms. Blaustein then proceeded to draft a new will in accordance with Evelyn's instructions. In this new will, ("The Blaustein Will"), Evelyn divided her estate evenly between her brother Edward and sister Ida[4] and made no provisions whatsoever for the Furlongs. Alvin Cassel was named the personal representative in this will. Evelyn executed "The Blaustein Will" on April 8, 1993, and at the time, Ms. Blaustein was satisfied that Evelyn fully understood the size of her and Jacob's estate, its income, and disbursements. Ms. Blaustein thereafter retained the original of this will for six weeks. During this period, Ms. Blaustein wrote a letter to Evelyn memorializing Evelyn's instruction that she "did not wish to waive any of [her] inheritance from [her] husband, especially since [she was not] anxious to have those assets passed directly to Estelle and her family."
Approximately one and a half months after Evelyn's execution of "The Blaustein Will," Estelle learned of its existence. Dr. Furlong testified that Estelle was upset when she learned about "The Blaustein Will" and thought it "only fair" that the Furlongs be put back into Evelyn's will. Thereafter, Estelle telephoned Ms. Blaustein to terminate her services as Evelyn's lawyer. Estelle also prepared a letter signed by Evelyn which directed Ms. Blaustein to return to Evelyn "the original interim will which you prepared for me dated April 8, 1993, which I intend to destroy."
Estelle and Evelyn picked up "The Blaustein Will" on May 24, 1993 from Ms. Blaustein's office. At that time, Ms. Blaustein gave Evelyn a letter memorializing her concern of Estelle's inherent conflict of interest in representing Evelyn where Estelle had borrowed stock from her late father which was still owed and unpaid to the estate and hence, Evelyn. Estelle's loan was documented by five notes from Jacob which instructed Evelyn to recoup the stock or deduct its value (i.e., approximately $96,000) from Estelle's inheritance under Jacob's will. Within two days of their visit to Ms. Blaustein, Estelle drafted a disclaimer for Evelyn's signature wherein Evelyn disclaimed any interest in the stock. Evelyn executed the disclaimer and Estelle maintained in the proceedings below that Evelyn was completely lucid and competent during this time.
Later, Estelle, as co-personal representative of her late father's estate, wrote to appellant, SunTrust Bank, formerly known as SunBank Miami, N.A., to inquire about her father's assets at the bank. Appellant, Theresa Heidel, a private banker at Sun-Trust responded in a letter. Later, Estelle and Evelyn, acting as co-personal representatives of Jacob's estate, then personally met with Heidel. At that time, Estelle asked to be the sole signatory of Jacob's estate to facilitate the payment of expenses as needed and Heidel explained that that would require Evelyn's written authorization. Evelyn did provide such authorization in writing.

C. "THE FURLONG WILL" DATED JUNE 1, 1993 AND THE ALLEGED INCEPTION OF THE CONSPIRACY
After Evelyn retrieved the original "Blaustein Will," Estelle drafted another will for Evelyn which she executed on June 1, 1993. In this will, Estelle was named as the personal representative and pursuant to its terms, the Furlongs were to receive 40% of Evelyn's estate and the remaining 60% of her estate was to be divided evenly between Evelyn's sister, Ida and brother, Edward.
At or about the time of Evelyn's execution of this will, Ida telephoned her son, Manny in St. Petersburg, Florida, to express her concern about Evelyn. According to Manny's unrefuted testimony, his mother told him that Evelyn was very depressed about Jacob's death and did not understand what Estelle was doing with Jacob's estate matters. Manny further testified that his mother wanted him to do whatever he could to *1278 help Evelyn. Shortly thereafter, Manny telephoned Evelyn at her home and re-introduced himself as he and Evelyn had not been particularly close prior to that time. He subsequently visited his aunt at her home.
According to Manny's testimony, Evelyn asked him to review and explain some documents for her, namely, the stock disclaimer that Estelle had asked her to sign, the five stock notes, the SunTrust document designating Estelle to serve as the sole signator on Jacob's estate account, and "The Furlong Will" dated June 1, 1993. Manny stated that Evelyn was unhappy with the terms of her latest will and that Estelle had not adequately explained these documents to her. Manny detected that his elderly aunt who was 82 at the time of his arrival had "difficulty understanding documents." Manny further testified that Evelyn asked if he knew of an attorney who could draft another will for her.

D. THE BROIDA WILL DATED JULY 9, 1993
Because Manny was unfamiliar with any attorney in the Miami area, he procured an attorney and friend, Joel Broida, from his hometown of St. Petersburg to prepare a new will for Evelyn. He immediately flew back to St. Petersburg alone to meet with Mr. Broida with both Evelyn's latest will and Jacob's will in hand.[5] Mr. Broida drafted a new will ("The Broida Will") for Evelyn without ever meeting or speaking to her. Manny was named as the personal representative for "The Broida Will." In this will, Ida received 20% of Evelyn's estate plus 100% of all tangible property, jewelry, and autos. Manny and his wife, Renee received 19% of Evelyn's estate. Edward and Evelyn's niece each received 5% of the estate and the remaining 51% of the estate was divided among Evelyn's other family members. With the exception of the bequest of a piano, the Furlongs were completely disinherited under "The Broida Will." Manny also had Mr. Broida draft a durable power of attorney for Evelyn's signature which, among other things, gave Manny the unrestricted and unlimited power to sell and dispose of Evelyn's assets.
When Manny returned to Miami with "The Broida Will" and power of attorney, he learned that Evelyn had arranged a meeting with Estelle to discuss the return of Jacob's stock. At this meeting, held on June 25, 1993 in Estelle's office, Evelyn requested Estelle to return the stock. Estelle declined to return the stock and insisted that Evelyn had voluntarily relinquished this stock to her as a gift. During this same meeting, Manny requested Estelle, as co-personal representative of Jacob's estate, to place some of Jacob's securities into the names of Evelyn and Manny or Renee, as joint tenants with rights of survivorship. Estelle declined this request as well. Prior to the conclusion of this meeting, Manny and/or Evelyn requested the return of the original "The Furlong Will" dated June 1, 1993.
At or about this time, Evelyn executed the durable power of attorney in favor of Manny which had been prepared by Mr. Broida. Manny immediately took possession of it. At this time, Evelyn also notified Heidel of Sun-Trust that she wanted Jacob's personal bank account transferred into her [Evelyn's] own name. Heidel, in turn, notified Estelle who agreed to the transfer. Later, Evelyn and Manny went to see Heidel at the bank for the purpose of having Evelyn named the sole signatory on Jacob's estate account. Heidel notified Estelle of the requested change and informed Estelle that she needed to immediately fax a letter of authorization for the same as Evelyn wanted to effectuate the change without delay.
On July 9, 1993, Evelyn executed "The Broida Will," bequeathing approximately 77% of her estate to Manny and his immediate family, at SunTrust Bank where Heidel and two other bank employees served as witnesses. Heidel testified that she never detected a lack of understanding or mental incapacity on Evelyn's part when she executed this will. Manny kept the original Broida Will and power of attorney in his home in St. Petersburg. Evelyn placed a copy of the will in her safe deposit box, where Estelle later found it. During this same time, Evelyn also *1279 rescinded Estelle's authority as sole signatory on Jacob's estate account.
During the summer and fall months of 1993, Manny increasingly spent more time with Evelyn and actually stayed at her home several days per week. In addition to serving as Evelyn's chauffeur, Manny became increasingly involved in her financial affairs. For example, he wrote out checks for Evelyn's signature and reconciled her bank statements.
On or about July 14, 1993, Evelyn and Manny went to see Heidel at the bank about the purchase of some securities because Evelyn was concerned that her assets were not generating sufficient income. Heidel introduced them to Blanca Lola-Teriele, an investment consultant at the bank. Teriele believed Evelyn to be in full control of her faculties and recommended that Evelyn purchase either a Franklin Insured Tax Free Income Mutual Fund or Putnam Municipal Fund. After discussing various options, Evelyn read and signed the application completed by Teriele and purchased approximately $450,000 in tax free securities. In purchasing these securities, Evelyn specifically requested that they be issued jointly in her name and either Ida or Manny's name so that no one else could gain control of them. Evelyn made it clear, however, that she wanted the income checks from these securities to be placed in her name alone as it was not her intent to make a present gift of the same to Ida or Manny.
Subsequently, Evelyn decided that she wanted these tax free securities to be placed in her name alone rather than jointly with Ida or Manny and informed Estelle of the same. Estelle, who had no reason to question Evelyn's competency to make this change, called Teriele at the bank to arrange for the transfer of securities. Estelle then told Ida and Manny of the requested transfer and procured their signatures on the requisite paperwork to effectuate the change. Thereafter, the securities were reregistered in Evelyn's name alone.
Sometime at or around this time period, Estelle became concerned about what she perceived as Manny's increasing influence over Evelyn's financial affairs. Estelle testified that she went to the bank to voice her concerns to Heidel and to solicit her assistance. Specifically, Estelle warned Heidel that "there is a shark in the water." Heidel responded "oh, she's all right, they're all right." Heidel took no actions as a result of Estelle's statements or concerns.
In late August, Estelle telephoned Heidel to inquire whether Manny had been in the bank with Evelyn. When Heidel replied yes, Estelle stated that she was very concerned that "there may be overreaching going on." Heidel testified that during her 1½ year interaction with Evelyn both inside and outside of the bank, Evelyn never demonstrated any lack of understanding or mental defect. She characterized Evelyn as being "sharp as a tack" and "feisty."
Thereafter, on September 2, 1993, Evelyn went to Heidel for the purpose of cashing a check in the amount of $9,800. Heidel wrote the check for Evelyn's signature. Heidel then authorized this check to be cashed. On the next day, Evelyn again cashed another check for $9,800 with Heidel's authorization. Heidel never questioned Evelyn about her need for any of this money. There is no record evidence of whether Manny was physically present inside of the bank with Evelyn when either of these checks were cashed.
Sometime late in the summer or early in the fall of 1993, Manny notified Dr. Furlong, Estelle's husband, that Evelyn was experiencing continuing depression and having memory problems. Dr. Furlong referred Evelyn to his friend, Dr. Peritz Scheinberg, a neurologist. On the day before her scheduled visit with Dr. Scheinberg, however, Evelyn went in to see Dr. Furlong. According to Dr. Furlong, Evelyn appeared to have understood and responded to his questions appropriately. He opined that she seemed to suffer from a type of aphasia (i.e., word forgetting) typical in octogenarians. Dr. Furlong saw no signs of Alzheimer's disease, incompetence, or dementia of any kind.
On September 2, 1993, Evelyn met with Dr. Scheinberg for a thirty minute examination. Dr. Scheinberg asked Evelyn questions and made clinical observations. Based upon his examination, Dr. Scheinberg opined and testified at the trial below on behalf of Estelle that Evelyn was suffering from "[p]robable *1280 senile dementia of the Alzheimer's type" which impaired her judgment. Dr. Scheinberg further opined that her dementia was so severe that it pre-existed her visit to him by at least one year and that he expected this condition to progressively worsen. This opinion was based upon his experience in general with Alzheimer patients rather than his particular examination of Evelyn. Notwithstanding his general conclusions about Evelyn, Dr. Scheinberg could not opine that the dementia affected her cognitive ability to understand the extent of her estate and heirs at any given time.[6] He further allowed for the possibility of variations in that Evelyn could have had good days and bad days in terms of her decision-making process.[7]
Dr. Scheinberg testified that after he examined Evelyn, he told Manny of his findings and gave him a copy of the medical report. Dr. Scheinberg also immediately telephoned Dr. Furlong to apprise him as well. Dr. Furlong testified that he, in turn, withheld Dr. Scheinberg's findings about Evelyn from Estelle because Estelle was a "sick girl" and the news about Evelyn might be devastating to her health. Neither Dr. Furlong nor Manny ever told anyone at SunTrust about Dr. Scheinberg's findings. Manny later mailed a copy of Dr. Scheinberg's medical report to Manny's nephew, an internist in Michigan, to see if he could suggest any treatment. Manny's nephew informed him of a new memory drug which Dr. Furlong, at Manny's request, then prescribed for Evelyn. Evelyn never had any follow-up visits with any other doctors regarding Dr. Scheinberg's findings.
During the fall of 1993, Evelyn's relationship with the Furlongs was amicable as Evelyn, Manny, and the Furlong family dined out together frequently. It was during this period that Evelyn informed Manny that she was no longer satisfied with the terms of "The Broida Will" and the power of attorney. According to Manny's testimony, Evelyn *1281 wanted the will to be redrafted and the power of attorney destroyed.
Prior to having her will redrafted, Estelle took Evelyn to SunTrust in November 1993 to inquire about a custodial account for Evelyn. There they met with appellant Lucille Clum, a trust officer at the bank. Estelle explained to Clum that Evelyn was recently widowed and needed assistance with her checks and finances. During this meeting, Estelle told Clum that Manny had taken over Evelyn's affairs and that she "was very concerned that there might be some overreaching." Evelyn said little except that she was sad about the death of Jacob and stated that she wanted to know what the bank's role would be in a custodial account. Clum explained to her that the bank could do as much or as little as she wanted"safe-keep the assets, collect the income, and pay ... out the income to her in whatever form she wanted." Evelyn told Clum that she would think about it and get back to her. On their way out of the bank building, Estelle and Evelyn ran into Heidel, at which time Estelle repeated her concerns about Manny.

E. THE FURLONG WILL A/K/A "THE HAPPY FAMILY WILL" DATED DECEMBER 22, 1993
Sometime in late December 1993, Estelle and Evelyn went to Evelyn's safe deposit box where Estelle read "The Broida Will" and power of attorney. Estelle testified of her "shock" when she saw these documents as she was certain that they were the product of undue influence. Subsequently, she met with Evelyn and Manny to discuss the terms for a new will which Estelle intended to prepare herself. The new Furlong will ("The Happy Family Will") gave 40% of Evelyn's estate to the Furlongs, 10% to Ida, 30% to Manny, 15% to Edward and 5% to Edward's daughter. Estelle and Manny would be appointed co-personal representatives. Evelyn executed this will on December 22, 1993 in Estelle's office. Manny was not present. Prior to Evelyn's execution of the will, Estelle again explained its terms and Evelyn appeared to be contented. According to Lynee Blum, an attorney who witnessed the execution, Evelyn seemed to have understood the terms of the will and appeared to be lucid. After Evelyn's execution of this new Furlong will, Estelle testified that all of the relatives were "one big happy family." Estelle, however, never told anyone at SunTrust about this new will because "it was none of their business."
From December 1993 until May 1994, Evelyn lavished both her immediate family and the Furlong family with cash and other non-monetary gifts. Even Manny's mother-in-law, appellant Freida Pantzer, who occasionally stayed over at Evelyn's apartment, received gifts. At no time did any of the gift recipients question Evelyn's competency to make such gifts or offer to return them. With the exception of her brother Edward who was not a gift recipient, Evelyn gave gifts and cash to Manny and his family totalling approximately $1.5 million dollars. The Furlong family received gifts and cash totalling over $500,000. Dr. Furlong testified that Evelyn's generosity was not new as she has always been "a very generous lady."
One of Evelyn's "gifts" to Estelle led to the ultimate rift between the two and the end of the "happy family" relationship. On or about May 20, 1994, Estelle accompanied Evelyn to the bank where Evelyn signed the proceeds of a maturing $350,000 treasury bill over to Estelle. Estelle then deposited the same into her personal checking account. Within a few weeks thereafter, Evelyn sought the return of this money and explained to both, Estelle and Dr. Furlong, that she had mistakenly given Estelle the treasury bill and had not intended it as a gift. Estelle refused to return the money and responded that Evelyn knew exactly what she was doing when she made the gift. This exchange between Evelyn and Estelle was extremely bitter and Estelle thereafter testified that she deemed herself "out of the picture" as a result of this incident.

F. "THE BARASH WILL" DATED JULY 8, 1994
Thereafter, on June 30, 1994, Evelyn and Manny went to see Miami attorney, Jeffrey Barash, about a new will for Evelyn. Evelyn and Manny selected Barash by virtue of his ad in the telephone book and his office's proximity to Evelyn's home. When they arrived at Barash's office, Manny initially remained *1282 in the waiting room while Evelyn had her consultation with Barash. Barash testified that Evelyn told him that she had been born in Russia and when her family came to America, they settled in Detroit. She also told him about her career as a purchaser for a women's clothier, her life with Jacob, and her sadness at his passing. She further told him of her family and her deteriorating relationship with the Furlongs which was the reason that she desired a new will. Evelyn explained to Barash that the Furlongs were no longer treating her the way they had when Jacob was alive.
When Evelyn described her estate as being approximately $½ to $3 million dollars, Barash recommended that she have a revocable trust. Evelyn then requested that Manny be allowed in so that Barash could explain the workings of a trust to both of them. Manny then joined this consultation. Evelyn questioned Barash about her control of the trust and how it would operate in the event of her disability. After Barash explained about the trust, Evelyn selected Manny as successor trustee. Because Manny wasn't a resident of Dade County, Barash suggested that Evelyn also appoint a local successor co-trustee such as a bank. Evelyn selected appellant, SunTrust.
On her next visit to Barash's office, Evelyn discussed the dispositive provisions of her proposed new will. Evelyn told Barash that she wanted 40% of her estate to be left to Manny and his wife, Renee; 30% to be left to Edward; and 30% to be left to Ida. She further bequeathed $100,000 to Dr. and Mrs. Furlong and $25,000 to each of their children. Manny was not present in the room with Evelyn and Barash at this time or at any other time when the will provisions were being discussed.
Evelyn executed the "The Barash Will and Trust" on July 8, 1994. Barash had arranged for Clum from SunTrust to serve as a witness for Evelyn's execution of the will and trust as he anticipated an attack on Evelyn's testamentary capacity by virtue of the fact that Evelyn had substantially disinherited the Furlongs. Although Manny had driven Evelyn to Barash's office, he remained outside during the execution of these documents. Prior to her execution of the documents, Barash reviewed them with Evelyn to make sure that she understood all of the provisions. Barash testified that Evelyn appeared to have fully understood what was explained to her.
After her execution of "The Barash Will and Trust," Evelyn later returned to Barash's office to express her frustration at Estelle's refusal to return the proceeds of the $350,000 treasury bill. Barash suggested that she could compensate for the loss by merely amending her trust to further decrease her gifts to the Furlongs. Accordingly, on August 11, 1994, Evelyn executed an amendment to "The Barash Will and Trust" which reduced the bequest to the Furlongs to just $1,000. The reason for the reduction was explicitly stated in the amendment. "The Barash Will and Amended Trust" ultimately was the final will executed by Evelyn.
At or about the time that Evelyn was preparing to execute "The Barash Will and Trust," during the summer of 1994, Dr. Furlong contacted Evelyn's brother, Edward, to find out why Manny was sequestering Evelyn. Dr. Furlong testified that he told Edward that Evelyn could be "the victim" of stealing and financial draining by Manny. Edward thanked him for calling and told Dr. Furlong that he would get back to him within two weeks. Edward never telephoned Dr. Furlong again.
Further, during this period, Manny's mother-in-law, Frieda, increasingly spent more time with Evelyn and drove her around town. As a result of their friendship, Evelyn began to see Frieda's personal doctor, Dr. Ernest Herried, instead of Dr. Furlong. Dr. Herried found Evelyn to be mentally alert and responsive to his questions about her medical problems.

EVELYN'S FINAL MONTHS
In January 1995, Jacob's estate was closed and Estelle forwarded the closing documents to Evelyn for her signature along with the remaining $9,400 from his estate account. Evelyn executed and returned the documents along with $9,400 to Estelle.
Evelyn became ill in early March 1995. She went to see Dr. Harried but refused to comply with his suggestion that she be hospitalized. *1283 Evelyn died from her illness in her apartment on March 3, 1995.

I

PROCEEDINGS BELOW
Approximately two weeks after Evelyn's death, Manny and SunTrust as co-personal representatives of Evelyn's estate of "The Barash Will and Amended Trust" filed a petition for administration of that will. Shortly thereafter, Estelle filed a petition for administration of "The Furlong Will" (a/k/a "The Happy Family Will") dated December 22, 1993 and a verified petition to set aside "The Barash Will and Amended Trust" on the grounds that they had been procured through undue influence and overreaching. Edward and Ida as named beneficiaries under "The Barash Will and Amended Trust" were granted permission to intervene in this proceeding.
Subsequently, Estelle filed a "Substituted Petition for Administration" requesting that "The Lost Will" dated January 23, 1992 be admitted to probate rather than "The Happy Family Will" dated December 22, 1993. Estelle also filed a two count amended petition against appellants alleging that they conspired to deprive Evelyn of her estate through undue influence, duress, and intimidation and that Evelyn lacked testamentary capacity.[8] Estelle sought equitable relief in the form of an accounting, restitution, and the imposition of a constructive trust. Estelle also sought to have "The Barash Will and Amended Trust" declared void and of no effect. Later, Estelle amended these pleadings to allege that all of Evelyn's wills after "The Lost Will" dated January 23, 1992 were the products of Evelyn's incompetency and/or appellants' undue influence. Estelle never sought compensatory or punitive damages in any of her pleadings. Rather, ten days prior to trial, Estelle moved to amend her petition to assert a claim for punitive damages. The lower court did not entertain this motion to amend until two days prior to the end of the eleven day trial. When the appellants objected to the proposed amendment on the grounds that Estelle had made no threshold showing of an entitlement to punitive damages, the trial court decided to take the matter under advisement pending its final judgment in the cause.[9]

II

FINAL JUDGMENT OF LOWER COURT
The trial court entered its final judgment finding that there was clear and convincing evidence that a reprehensible conspiracy had been formed by the appellants to deprive Evelyn of her money and assets during her lifetime through undue influence and in the case of the bank and its employees, through a breach of their fiduciary duty. The court found that the bank was additionally negligent in its hiring, training, retention, and supervision of its employees, Heidel and Clum. Accordingly, the lower court entered a *1284 final judgment in the equitable action in favor of Evelyn's estate and against the appellants, jointly and severally, in the amount of $1,533,689.55, including prejudgment interest. The court further assessed punitive damages against SunTrust Bank in the amount of $4,500,000; Manny in the amount of $2,000,000; Edward and Frieda each in the amount of $1,000,000.
In the will contest litigation, the lower court declined to admit "The Barash Will and Amended Trust" to probate on the grounds that it had been procured by undue influence and overreaching by Manny and that the decedent lacked testamentary capacity to execute the same. In fact, the court declared that all of the decedent's wills executed subsequent to "The Lost Will" dated January 23, 1992 had been procured by undue influence and/or the decedent lacked testamentary capacity to execute the same. Accordingly, the lower court admitted "The Lost Will" dated January 23, 1992 to probate. This appeal followed.

III

EQUITABLE CLAIMS LITIGATION
We first address the final judgment as it relates to the equitable claims litigation. Appellants assert, among other things, that the judgments entered against them must be reversed where the evidence adduced by appellee Furlong was insufficient to make a prima facie showing of any civil conspiracy to deprive the decedent of her money and assets during her lifetime through undue influence and/or breach of a fiduciary duty. The bank further asserts that the lower court erred in imposing liability against it for the negligent hiring, training, and retention of Clum and Heidel where these theories were never pled or tried by consent.
Based upon our careful review of the record, we agree with the appellants that all of the judgments entered against them must be reversed where the evidence was insufficient to establish the existence of a civil conspiracy[10] in the first instance. A civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy. See Florida Fern Growers Assoc., Inc. v. Concerned Citizens of Putnam County, 616 So.2d 562, 565 (Fla. 5th DCA 1993); Nicholson v. Kellin, 481 So.2d 931, 935 (Fla. 5th DCA 1985). Additionally, an actionable conspiracy requires an actionable underlying tort or wrong. See Florida Fern Growers, 616 So.2d at 565; Wright v. Yurko, 446 So.2d 1162, 1165 (Fla. 5th DCA 1984).
Thus, a cause of action for civil conspiracy exists ... only if `the basis for the conspiracy is an independent wrong or tort which would constitute a cause of action if the wrong were done by one person.'
Blatt v. Green, Rose, Kahn & Piotrkowski, 456 So.2d 949, 951 (Fla. 3d DCA 1984) (citing American Diversified Ins. Servs., Inc. v. Union Fidelity Life Ins., 439 So.2d 904, 906 (Fla. 2d DCA 1983)). In this case, the appellee apparently maintained below that the underlying actionable torts were the appellants' undue influence and the bank's breach of fiduciary duty.
Appellee Furlong's sole proof of the inception of the conspiracy was Ida's telephonic request to her son, Manny, that he contact the decedent to render assistance to her after her late husband's death. Without more, we find this evidence to be wholly insufficient for the establishment of a conspiracy. As Manny and Ida were the only parties privy to this telephonic conversation, Furlong obviously had no direct proof of any agreement to use undue influence to loot the decedent of her assets during her lifetime. While Furlong correctly asserts that a conspiracy may be proven by circumstantial evidence, this may be done "only when the inference sought to be created by such circumstantial evidence outweighs all reasonable inferences to the contrary." Diamond v. Rosenfeld, 511 So.2d 1031, 1034 (Fla. 4th DCA 1987), rev. denied, 520 So.2d 586 (Fla. 1988). Here, it cannot be said that the inference of a conspiracy outweighs all reasonable inferences to the contrary. A reasonable inference can be made that Ida's sole motivation *1285 for telephoning Manny was her sheer concern for the well-being of her elderly, recently widowed sister who had always been kind to her. The finding of the formation of a conspiracy during this telephone conversation would be pure speculation at best, and insufficient to sustain the civil judgment. Moreover, there was absolutely no evidence that the remaining appellants had knowledge of the alleged conspiracy or that they knowingly participated in it. See James v. Nationsbank Trust Co. Nat'l Assoc., 639 So.2d 1031, 1033 (Fla. 5th DCA 1994) (mortgagors failed to establish bank's involvement in conspiracy where it was alleged only that bank had knowledge that development company's continuing fraud was aided if bank supplied the loan); see also Menendez v. Beech Acceptance Corp., 521 So.2d 178, 180 (Fla. 3d DCA 1988) (some proof of knowledge of a conspiracy and participation by tortfeasor must be shown to survive summary judgment); Trautz v. Weisman, 809 F.Supp. 239, 246 (S.D.N.Y.1992) (mere knowledge of the conspiracy is insufficient; there must be an actual knowing participation). To assume or speculate, as appellee would have us do, that the remaining appellants participated in a conspiracy formed by Ida and Manny merely because they ultimately received some benefits from the decedent is insufficient for the imposition of liability against them.[11]See Karnegis v. Oakes, 296 So.2d 657, 659 (Fla. 3d DCA 1974), cert. denied, 307 So.2d 450 (Fla.1975). Thus, we find that the lower court erred in finding that the appellants participated in a conspiracy to extract gifts and benefits from the decedent during her lifetime through the exercise of undue influence or the breach of a fiduciary duty.
We also agree with the appellant bank that the lower court erred in finding it negligent for the hiring, retention, and supervision of appellants Heidel and Clum where this theory was never pled or tried by consent. Appellee asserts, however, that this theory was implicitly tried by consent where the bank failed to lodge an objection below. We disagree. A failure to object cannot be construed as implicit consent to try an unpled theory when the evidence introduced is relevant to other issues properly being tried. See Bilow v. Benoit, 519 So.2d 1114, 1116 (Fla. 1st DCA 1988); Wassil v. Gilmour, 465 So.2d 566, 569 (Fla. 3d DCA 1985). Here, we think that appellee's evidence of the bank's failure to supervise and train Heidel and Clum was directly relevant to the issue of the bank's breach of fiduciary duty to the decedent. Thus, the bank's failure to object to this evidence cannot properly be construed as its implicit consent to the trial of this unpled theory. Rule 1.190(b), Fla. R. Civ. P., which permits unpled issues to be expressly or implicitly tried by consent of the parties was never intended to allow one party to catch the opposing party off guard and inject new unpled issues that are relevant and related to other issues properly before the court.
For all of these reasons, we reverse all the judgments entered against the appellants and remand with instruction that final judgment be entered in their favor on the main action.

IV WILL CONTEST LITIGATION
Finally, we address that portion of the final judgment which relates to the will contest litigation. Appellants, with the exception of the bank and its employees,[12] urge that the lower court erred as a matter of law in admitting "The Lost Will" dated January 23, 1992 to probate upon its conclusion that the decedent's last executed will, "The Barash Will and Amended Trust," was void due to the decedent's lack of testamentary capacity and/or Manny's undue influence. We agree and reverse this portion of the final judgment as well.

*1286 TESTAMENTARY CAPACITY

It has long been emphasized that the right to dispose of one's property by will is highly valuable and it is the policy of the law to hold a last will and testament good wherever possible. See In re Weihe's Estate, 268 So.2d 446, 451 (Fla. 4th DCA 1972), quashed on existing facts, 275 So.2d 244 (Fla.1973); In re Dunson's Estate, 141 So.2d at 604. To execute a valid will, the testator need only have testamentary capacity (i.e. be of "sound mind") which has been described as having the ability to mentally understand in a general way (1) the nature and extent of the property to be disposed of, (2) the testator's relation to those who would naturally claim a substantial benefit from his will, and (3) a general understanding of the practical effect of the will as executed. See In re Wilmott's Estate, 66 So.2d 465, 467 (Fla. 1953); In re Weihe's Estate, 268 So.2d at 448; In re Dunson's Estate, 141 So.2d at 604. "A testator may still have testamentary capacity to execute a valid will even though he may frequently be intoxicated, use narcotics, have an enfeebled mind, failing memory, [or] vacillating judgment." In re Weihe's Estate, 268 So.2d at 448. Moreover, an insane individual or one who exhibits "queer conduct" may execute a valid will as long as it is done during a lucid interval. See Id. Indeed, it is only critical that the testator possess testamentary capacity at the time of the execution of the will. See Id; see also Coppock v. Carlson, 547 So.2d 946, 947 (Fla. 3d DCA 1989) (whether testator had the required testamentary capacity is determined solely by his mental state at the time he executed the instrument), rev. denied, 558 So.2d 17 (Fla. 1990).
An appellate court will not interfere with a probate court's finding of testamentary capacity unless there is an absence of substantial competent evidence to support the finding or unless it appears that the probate court has misapprehended the effect of the evidence as a whole. See In re Weihe's Estate, 268 So.2d at 449. It is the duty of the appellate court to examine all of the evidence to determine whether there is substantial and competent evidence to support the findings of the probate court and whether the probate court may have misinterpreted the legal effect. Further, where the probate court has misinterpreted the legal effect of the evidence in its entirety, its findings will not be affirmed merely because there is evidence that is contradicted on which the findings may be predicated. See Lambrose v. Topham, 55 So.2d 557, 558 (Fla.1951) (citing Hooper v. Stokes, 145 So. 855, 857, 107 Fla. 607, 610 (1933)). Any rule to the contrary would render a probate court's finding of testamentary capacity virtually unassailable on appeal.
In the instant case, the lower court, citing to Dr. Scheinberg's testimony, concluded that the decedent lacked the requisite testamentary capacity to execute "The Barash Will and Amended Trust." Our review of the evidence leads us to find that the lower court's conclusion in this regard was erroneous as a matter of law and that the court simply misinterpreted the legal effect of Dr. Scheinberg's testimony. Although Dr. Scheinberg opined that the decedent suffered from severe dementia which would progressively worsen, and that her judgment was significantly impaired on the date of his exam, he categorically testified that he was unable to offer any opinion as to her testamentary capacity at any given time. Moreover, Dr. Scheinberg did allow for the possibility of the decedent having "lucid intervals" in her decision-making process. The appellee offered no evidence that the decedent was incompetent or not lucid at the time she made the "The Barash Will and Amended Trust." See Coppock 547 So.2d at 947. In fact, the evidence was to the contrary. Given that the presumption of testamentary capacity is so strong in Florida that it allows for a demented or insane person to execute a valid will during a "lucid interval," see Murrey v. Barnett Nat'l Bank, 74 So.2d 647, 649 (Fla. 1954), the trial court's conclusion that the decedent lacked testamentary capacity to execute "The Barash Will and Amended Trust" simply did not comport with the evidence adduced at trial and may not stand as a matter of law.

UNDUE INFLUENCE
The lower court additionally found that "The Barash Will and Amended Trust" was void because it was procured by "undue influence and overreaching by Manny *1287 in violation of a confidential or fiduciary relationship." When a will is challenged on the grounds of undue influence, the influence must amount to over persuasion, duress, force, coercion, or artful or fraudulent contrivances to such an extent that there is a destruction of free agency and willpower of the testator. See In re Carpenter's Estate, 253 So.2d 697, 704 (Fla.1971); In re Dunson's Estate, 141 So.2d at 605; see also Estate of Brock, 692 So.2d 907, 911 (Fla. 1st DCA 1996), rev. denied, 694 So.2d 737 (Fla. 1997). A presumption of undue influence arises in favor of a will contestant if it is established that a substantial beneficiary under the will occupied a confidential relationship with the testator and was active in procuring the contested will. See In re Carpenter's Estate, 253 So.2d at 701; Brock, 692 So.2d at 911; Elson v. Vargas, 520 So.2d 76, 76 (Fla. 3d DCA), rev. denied, 528 So.2d 1181 (Fla.1988). The origin of the confidence between the benefactor and testator is immaterial and the confidential relationship is broadly defined:
The rule embraces both technical fiduciary relations and those informal relations which exist wherever one man trusts in and relies upon another.
* * * * * *
The relation and the duties involved in it need not be legal. It may be moral, social, domestic, or merely personal.
In re Carpenter's Estate, 253 So.2d at 701 (citing Quinn v. Phipps, 113 So. 419, 421, 93 Fla. 805, 810 (1927)). As for a determination of whether a substantial beneficiary was active in the procurement of the will, our supreme court in In re Carpenter's Estate outlined the following nonexclusive list of factors for the court's consideration:
a) presence of the beneficiary at the execution of the will;
b) presence of the beneficiary on those occasions when the testator expressed a desire to make a will;
c) recommendation by the beneficiary of an attorney to draw the will;
d) knowledge of the contents of the will by the beneficiary prior to execution;
e) giving of instructions on preparation of the will by the beneficiary to the attorney drawing the will;
f) securing of witnesses to the will by the beneficiary; and
g) safekeeping of the will by the beneficiary subsequent to execution.
253 So.2d at 702. These listed criteria are only general guidelines and a will contestant is not required to prove them all to establish active procurement. See Id. Each case is fact specific and the significance of any (or all) of such criteria must be determined with reference to the particular facts of the case.
Once the presumption of undue influence arises, the burden shifts to the beneficiary of the will to come forward with a reasonable explanation of his or her active role in the preparation of the decedent's will. See Brock, 692 So.2d at 912. If the presumption goes unrebutted, it alone is sufficient to sustain the contestant's burden. See Id. On the other hand, if the presumption is rebutted, the contestant must establish undue influence by a preponderance of the evidence. See Tarsagian v. Watt, 402 So.2d 471, 472 (Fla. 3d DCA 1981).
With reference to "The Barash Will and Amended Trust," the lower court found that a presumption of undue influence was created by virtue of Manny's: 1) role in finding Mr. Barash; 2) role in procuring "The Barash Will and Amended Trust"; and 3) control of the decedent's personal and financial affairs.[13] The court further found *1288 that the presumption had not been rebutted by a reasonable explanation for Manny's acts and conduct. Alternatively, the lower court found that even in the absence of the presumption, Manny's undue influence had been proven by the greater weight of substantial and competent evidence. We do not agree that the evidence supports either of the lower courts' alternative conclusions.
First of all, we do not agree that the record evidence was sufficient to create a presumption of undue influence. Although Manny was a substantial beneficiary under the challenged will and does not contest the fact that he enjoyed a confidential relationship with the decedent during her final years, there was insufficient evidence to establish that he was active in the procurement of this will. Although Manny was present when the decedent expressed her desire to revoke the Furlong "The Happy Family Will" and make a new will, the unrefuted evidence below does not support the lower court's finding that Manny procured attorney Barash for the decedent or that Manny was even familiar with this attorney for that matter.[14] According to the only evidence adduced, Barash was randomly selected from the yellow pages by virtue of his proximity to the decedent and specialty. There was no evidence that Manny gave any instructions to attorney Barash as to the preparation of the challenged will and trust; nor was there any evidence that Manny had knowledge of the dispositive provisions of the decedent's proposed final will.[15] Further, Manny was not present at the execution of the challenged will and all of the witnesses to the decedent's execution of this will were independently procured by Barash. Finally, Manny did not see or take possession of these documents after the decedent's execution of the same.
Under these facts, we do not believe that a presumption of undue influence properly arose. Even assuming, arguendo, that such a presumption could be created, we find that there was a clear and reasonable explanation to rebut this presumption. The decedent expressed her desire to revoke the Furlong "Happy Family Will" and disinherit the Furlongs in the aftermath of her bitter dispute with appellee over the proceeds of the $350,000 treasury bill. It was uncontroverted that the decedent was extremely angry because she perceived (whether correctly or incorrectly) that her stepdaughter had wrongfully taken advantage of her by misappropriating the proceeds of the treasury bill. The expressed reason given by the decedent for further diminishing her bequest to Estelle with the amendment to the challenged will was to compensate for the unreturned proceeds from the treasury bill. Given these unrefuted facts, Manny's explanation that he merely facilitated the decedent's independent decision to change her will after her dispute with Estelle was reasonable under these circumstances.[16]
In the absence of the presumption, we similarly cannot agree that appellee met her burden of establishing undue influence by the greater weight of the evidence. See In re Carpenter's Estate, 253 So.2d at 704-05; Coppock, 547 So.2d at 947. The unrefuted record evidence indicates that the decedent's sole motivation for disinheriting the appellee's family from her final will was the decedent's anger and animosity towards appellee over the treasury bill incident. Thus, the lower court's finding that the decedent was somehow "duped" into making her last will by Manny is not sustainable by the record evidence and must be reversed.
*1289 In conclusion, given the sound policy of this state to effectuate the last wishes of a decedent as expressed in his or her final will and given the dearth of substantial evidence of lack of testamentary capacity or undue influence, in this cause, we are compelled to respect the decedent's last wishes as expressed in "The Barash Will and Amended Trust." See Coppock, 547 So.2d at 947. Accordingly, we reverse that portion of the final judgment directing that the decedent's will dated January 23, 1992 (i.e., "The Furlong Will" or "The Lost Will") be admitted to probate and remand with instructions that the decedent's last executed will and amendment thereto, "The Barash Will and Amended Trust," be admitted to probate.
Reversed and remanded with directions.
NOTES
[1] Evelyn's brother Edward owned a business and was financially secure in his own right.
[2] In this will, Evelyn also made a $15,000 bequest to Ida's son, Manny Raimi and his wife, Renee.
[3] For example, Ms. Blaustein testified that even though Jacob had left Evelyn 77% of his estate, Evelyn believed that Jacob had disinherited her. Ms. Blaustein further testified that Evelyn feared that she was going to be left destitute despite her being worth more than $3 million dollars in her own right.
[4] In "The Blaustein Will," Evelyn's friend, Rose Alpert was made a beneficiary of a $50,000 bequest.
[5] While he was away, Evelyn travelled with the Furlongs to Atlantic City, New Jersey to gamble and attend Dr. Furlong's 45th high school reunion.
[6] Dr. Scheinberg testified as follows:

Q. Did she have the cognitive ability to know approximately what her estate consisted of, or are you unable to venture an opinion on that?
A. I can't answer that. I suspect that she had the cognitive ability to know a figure. Whether she understood the significance of that figure, I don't really know. She definitely had problems with arithmetic calculations, and with reading comprehension.
* * * * * *
Q. Did she have the cognitive ability to know who her heirs were?
A. I didn't ask her that question. I can't reallyI can't decide that.
* * * * * *
Q. Does [sic] judgment impairment prevent her from knowing what her estate consists of and who her heirs are?
A. I don't think necessarily. It depends on the extent of the dementia.
* * * * * *
[7] In this regard, Dr. Scheinberg further testified as follows:

Q. Is it reasonably possible that some five, six, seven months before you saw her, that she had a far greater cognitive ability than what you saw on September 2, 1993?
A. Is it possible?
Q. Reasonably possible.
A. What does that mean, 51 percent?
Q. Okay, 51 percent.
A. I would have to say that based in medical probability, that for the preceding year, that her judgment was impaired to the point that I would have viewed her as demented.
Is there a possibility, yes I mean, there can be variations. Her depression might not have been as severe. And she may have been an aberrant or unusual case, I don't know, I didn't see her before.
* * * * * *
Q. If some approximately six months prior to the time that you saw her she's asked a series of questions, such as when did your husband die; she answers appropriately: How long have you been married; and she answers appropriately: Where do you live; and she gives the address and the telephone number of where she lives and gives the zip code number. And is asked what her purpose in visiting the lawyer is, and she tells the lawyer that she wants to be represented in connection with her husband's estate, and she wants to prepare a new will: That she gives the lawyer her maiden name: That she tells the lawyer who her heirs are, and that she tells the lawyer how she wants her estate distributed, do you have an opinion as to whether or not that's an indication that she intellectually understood what was going on and knew what she was doing at that time?
A. It suggests it. It suggests that there werethat superficially at least she knew the things which you have described.
I want to remind you that my role in this process was to see her as a neurologist on a specific occasion, and then was subsequently asked to extrapolate backwards and determine how long I thought there had been the same kind of problem present. But I cannot quantitate it.
* * * * * *
[8] Specifically, Count I alleged that:

[b]eginning approximately April/May, 1993 and continuing to the date of Evelyn S. Gruber's death, Manuel Raimi, Renee Raimi and Ida Raimi, enjoying a confidential and/or fiduciary relationship with Evelyn S. Gruber, conspired, using undue influence, duress and intimidation to deprive Evelyn S. Gruber of her money and assets. That conspiracy was later joined by Frieda Pantzer, Edward Schultz, Theresa Heidel, Lucille Clum, and SunBank/ Miami, N.A., each of whom also enjoyed a confidential and/or fiduciary relationship with Evelyn S. Gruber.
As a result of the conspiracy, the conspirators deprived Evelyn S. Gruber of substantial monies and other assets.
Count II alleged the same conspiracy and continued as follows:
On July 8, 1994, in furtherance of said conspiracy, the respondents caused Evelyn S. Gruber to execute a Last Will and Testament and a Revocable Trust. On August 11, 1994, in furtherance of said conspiracy, the respondents caused Evelyn S. Gruber to execute a First Amendment to Evelyn S. Gruber Revocable Trust dated July 8, 1994. A copy of these respective documents are [sic] attached hereto as Exhibits 1, 2 and 3.
On the date of the execution of Exhibits 1, 2 and 3, Evelyn S. Gruber lacked testamentary capacity. Alternatively, and/or additionally, the execution of Exhibits 1, 2 and 3 was procured by the conspirators by duress, intimidation and undue influence.
[9] We note also that counterclaims and crossclaims for fraud, undue influence, and tortious interference were likewise filed against Estelle and Dr. Furlong which were ultimately dismissed by the lower court. Because the appellants have not elected to appeal their dismissal, we do not address the same.
[10] Our holding in this regard thus obviates our need to address the appellants' further challenge to the entry of a judgment for compensation and punitive damages in an equitable proceeding.
[11] The entire basis for appellee's conspiracy claim appears to be that the appellants were the recipients of the decedent's generosity in some manner during her lifetime. The undisputed record evidence, however, disclosed that the decedent had a long history of being generous to others and mere affection, kindness, or attachment of one person for another does not itself constitute undue influence. See In re Dunson's Estate, 141 So.2d 601, 605 (Fla. 2d DCA 1962). Ironically, if we were to follow appellee's reasoning, she and her family members would also have to be declared co-conspirators since they too were benefactors of the decedent's generosity during her lifetime.
[12] These appellants take no position on this issue.
[13] Curiously, the lower court also justified the presumption of undue influence on Manny's role in procuring the earlier Broida will and durable power of attorney and retaining these documents for safekeeping after their execution. Assuming without deciding that the creation and execution of these documents were the products of Manny's undue influence, it is undisputed that they were both destroyed at the decedent's request a year prior to the execution of "The Barash Will and Trust." Any undue influence utilized to procure the Broida documents was wholly irrelevant to the question of whether the subsequent Barash documents were also the product of undue influence. Consequently, we think that appellee, as the contestant to the Barash documents, was required to come forth with independent evidence that "The Barash Will and Amended Trust" was likewise the product of Manny's undue influence. See Martin v. Martin, 687 So.2d 903, 906 (Fla. 4th DCA 1997) ("A finding that the decedent was susceptible to undue influence on one of the dates would not have been conclusive as to his state of mind on the other date."); see also In re Dunson's Estate, 141 So.2d at 604 (mental capacity of testator at the time he executed will is determinative factor).
[14] Indeed, the unrefuted evidence was that Manny was totally unfamiliar with any attorney in the Dade County area.
[15] Although Barash brought Manny into his office briefly to explain the mechanics of a trust, Barash testified that at no time was Manny present when the dispositive provisions of the will and trust were discussed with the decedent.
[16] It is noteworthy that the decedent's decision to disinherit the Furlongs in "The Barash Will and Amended Trust" was not without precedent. Prior to Manny's arrival and alleged undue influence, the decedent had disinherited the Furlongs in the Blaustein Will. This occurred at or about the time of the decedent's dispute with appellee over the appellee's failure to repay the borrowed securities from Jacob's estate. Thus, the record evidence suggests that the decedent appears to have disinherited her stepdaughter's family during those times when she believed that they were mistreating her.