692 So.2d 907 (1996)
ESTATE OF Conway BROCK, Deceased.
Conway BROCK, Jr., Appellant,
v.
Newman D. BROCK, Appellee.
No. 95-94.
District Court of Appeal of Florida, First District.
November 7, 1996.
*908 Robert W. Goldman of Robert W. Goldman, P.A., Naples, for Appellant.
James P. Judkins of Kitchen, Judkins, Simpson & High, Tallahassee, for Appellee.

ON APPELLANT'S MOTION FOR REHEARING, CLARIFICATION, CERTIFICATION, AND REHEARING EN BANC

ON APPELLEE'S MOTION FOR CORRECTION AND CLARIFICATION
JOANOS, Judge.
After consideration of the motions filed by the respective parties, we withdraw the majority opinion issued in this cause on July 2, 1996, and substitute the following revised opinion in its place. To the extent the revised opinion does not respond to points raised in the parties' motions, those points are denied.
Appellant, Conway Brock, Jr., appeals the circuit court's order rejecting appellant's request to revoke probate of the last will and testamentary trust executed by Conway Brock (Dr. Brock), retired veterinarian, who died January 27, 1994, at the age of 82. After making some specific bequests, Dr. Brock left the residuary of his estate to his younger son and personal representative, Newman D. Brock, appellee in the distribution at issue in this proceeding. Appellant, Dr. Brock's older son, contested probate, on grounds that the testamentary disposition was the product of undue influence. The issues presented in this appeal are: (1) whether the acting circuit court judge possessed authority to adjudicate the will and trust contest; and (2) whether the judge correctly applied the law of undue influence, the burden of proof, and the standard of proof to the facts of this case. We affirm the result reached by the trial court.[1]
A brief summary of the family history and a chronology of events is essential to an understanding of the facts pertinent to the undue influence issue in this case. Dr. Brock was married three times. His three children, a daughter and two sons, were born of the first marriage. Dr. Brock's daughter is not a party to this will challenge. After Dr. Brock's first marriage ended in 1949, he had very little contact with his children during the remainder of their childhood. Although he had some telephone contact with his sons during their college years, it appears he remained totally estranged from his daughter. There is evidence that his relationship with both sons improved in later years.
No children were born to Dr. Brock and his second wife, Margaret Z. Brock. Margaret Brock was and is a successful realtor and businesswoman. During their forty-year marriage, Dr. Brock and his second wife amassed substantial assets. The dissolution, in 1989, of Dr. Brock's second marriage generated vigorous litigation over the division of property acquired during the lengthy marriage.
*909 In December 1989, Dr. Brock contacted appellee, his attorney son, and asked him to visit. The call and request for a visit occurred during the time period when Dr. Brock was involved in the divorce from his second wife. He sought appellee's advice with respect to the financial aspects of the dissolution of marriage litigation. In late 1990, Dr. Brock remarried. Appellee testified that he did not see or confer with Dr. Brock again until the first part of 1993. At that point, Dr. Brock was involved in the dissolution of his third marriage.
In April or May 1993, Dr. Brock met with attorney Charles Isler, who practices in the area of estate planning and probate. Dr. Brock explained that he had been estranged from his children for a number of years, but he had had some recent contacts with his sons. Dr. Brock wished his attorney son, Newman, to be the personal representative and trustee of his estate, and his other son, Conway, Jr., to be the alternate personal representative. The residue of Dr. Brock's estate was to be divided equally between Conway, Jr. and Newman.[2] Mr. Isler described Dr. Brock as a fairly impatient man, who insisted that Mr. Isler draft a document and have it typed while Dr. Brock waited. Mr. Isler said Dr. Brock never read documents before signing them. Due to a drafting error in the final documents prepared by Mr. Isler, the names of the personal representatives and the relationships of some of the beneficiaries had to be corrected.[3] Subsequently, Mr. Isler learned that Dr. Brock's failure to return to his office to sign the corrected documents was due to Dr. Brock's mistaken belief that there would be an additional charge for the corrections.[4]
Attorney Rhonda Clyatt represented Dr. Brock in the dissolution of his second marriage. Ms. Clyatt said appellee wished to be apprised of everything concerning his father's divorce from Margaret, and he held numerous telephone conversations with Ms. Clyatt and with the attorney she associated. Ms. Clyatt also represented Dr. Brock in his divorce from his third wife. During that litigation, appellee provided Ms. Clyatt with legal research dealing with undue influence and the expedition of trials for elderly persons.
By July 1993, Dr. Brock's physical condition had worsened considerably, and in September 1993, he was quite ill. From July 1993 until Dr. Brock's death in January 1994, appellee spent considerably more time with Dr. Brock than he previously had done.
According to Ms. Clyatt, Dr. Brock discussed the disposition of his estate many times over the years, changing his mind several times. She used the estate plan devised by Mr. Isler to prepare the final will and trust documents executed by Dr. Brock. Her initial task was simply to correct the clerical errors in the will and trust documents. On August 27, 1993, the date of the final dissolution of Dr. Brock's third marriage, Ms. Clyatt met with Blondell Smith, a distant relative of Dr. Brock, and Dr. Brock, at a restaurant. During the meeting, Dr. Brock's estate plans were discussed. Ms. Clyatt's notes of that meeting indicated that at that point, Dr. Brock still intended to divide his estate between his two sons.
In a letter dated September 1, 1993, Ms. Clyatt advised Dr. Brock that a will and trust should be prepared at the earliest opportunity.[5] Ms. Clyatt described Dr. Brock as "pretty sick" during that time period. Due to his poor health, Dr. Brock was unable to keep an appointment at Ms. Clyatt's office on September 17, 1993. Ms. Clyatt and appellee met for dinner that same evening, and on the following day, Saturday, September 18, 1993, Ms. Clyatt met with Dr. Brock and *910 appellee at Dr. Brock's farm for a discussion of the estate plan.
Dr. Brock signed the contested will and trust documents in Ms. Clyatt's office on September 20, 1993. Ms. Clyatt then mailed the originals to appellee in accordance with Dr. Brock's instruction. Appellee executed the trust and returned a copy to Ms. Clyatt. When the will contest arose, Ms. Clyatt learned that after she sent the documents to appellee, he changed the first page of the durable power of attorney. The change consisted of removing appellant's name as the alternate attorney-in-fact.[6]
Between August 27, 1993, and September 18, 1993, Dr. Brock apparently decided to make appellee his primary beneficiary. Dr. Brock's paid caregivers and companions testified that Dr. Brock felt appellee cared for him, because he visited with Dr. Brock, and called to check on his wellbeing. Dr. Brock told these caregivers that his daughter and his older son had denied him as their father, and wanted nothing to do with him.
Martin Coates, Dr. Brock's accountant, described Dr. Brock as a very strong-willed person, but one who could be "very influenced" by persons who had gained his trust. The accountant explained: "He would listen to your advice and things of that nature as long as he trusted you and felt like you were not trying to get from him, I guess, some of his assets or what have you." Dr. Brock told Mr. Coates of his renewed relationship with his younger son, and spoke frequently of appellee to Mr. Coates. As to Dr. Brock's mental capacity, Mr. Coates was of the view that Dr. Brock understood his explanation of the tax consequences of a 1993 timber sale, and that Dr. Brock's mental ability was good.
George Exley, a retired forester and one of Dr. Brock's oldest friends, described him as a very confident, outspoken man. Mr. Exley felt Dr. Brock was capable of handling his own business affairs up until the last meeting Mr. Exley had with him. Mr. Exley echoed Mr. Coates's view of Dr. Brock's willingness to turn over business decisions to persons he trusted. Mr. Exley said Dr. Brock was not familiar with timber, and asked Mr. Exley to handle the timber sale for him. Mr. Exley described Dr. Brock as a very lonely man after his divorce from his second wife. At that time, he decided to contact his lawyer son for advice about his residual financial problems. According to Mr. Exley, Dr. Brock decided to leave most of his money to appellee, because he felt his older son did not care about him.
In order to implement the testamentary plan devised by Mr. Isler, appellee retained a lawyer to prepare quitclaim deeds to transfer Dr. Brock's real property to the revocable trust. During the 1993 Thanksgiving week-end, appellee went to his father's home with the deeds, then asked Mr. Coates to send someone to notarize the deeds. Appellee directed his judicial assistant to retype the first page of the durable power of attorney to remove appellant's name, and he arranged for execution of the document as modified. Appellee used the October 1993 durable power of attorney to transfer checking accounts in Dr. Brock's name to a joint survivorship account in the names of Dr. Brock and appellee. Appellee also used the general power of attorney when writing checks on the accounts. The record reflects that between October and December 1993, appellee transferred a number of bank accounts either to himself individually or to be held jointly with the decedent, and engaged in at least one real property transaction.
On December 28, 1994, after a lengthy evidentiary hearing, the acting circuit court judge found Dr. Brock was competent to make a testamentary disposition on September 20, 1993. The judge further found that a presumption of undue influence had not been established, and if it had been established, petitioner/appellee rebutted it by competent testimony. The judge was persuaded "that decedent in the last years of his life was able to establish a parent-child relationship with his son Newman. Decedent was not able to accomplish this with Sue nor Conway Jr." The judge denied with prejudice the request to revoke the probate of Dr. Brock's will.
*911 A post-judgment hearing was held February 6, 1995, on motions filed by both parties. In addition to a motion to stay the judgment pending the outcome of the appeal, appellant filed recently discovered copies of orders appointing the presiding county court judge to serve as circuit judge. Appellant's counsel argued that the successive appointments were improper, and the acting circuit court judge lacked subject matter jurisdiction of the cause. Appellant's counsel also argued against appellee's motion to release assets frozen by a prior order.[7]
The first issue raised is whether the acting circuit court judge possessed authority to adjudicate the controversy. The same issue was raised in the appeal from the order releasing assets. In the decision released September 27, 1995, this court affirmed the issue without comment. We decline to consider the issue further in this case, as in the recent case of Wild v. Dozier, 672 So.2d 16 (Fla.1996), the Supreme Court determined that the district courts do not have jurisdiction to review judicial assignments. That review is within the exclusive jurisdiction of the supreme court.
The second question presented in this appeal is whether the trial court correctly applied the law of undue influence and the proper burden of proof to the facts of this case. The burden of proof in will contests is set forth in section 733.107, Florida Statutes, which provides:
In all proceedings contesting the validity of a will, the burden shall be upon the proponent of the will to establish prima facie its formal execution and attestation. Thereafter, the contestant shall have the burden of establishing the grounds on which the probate of the will is opposed or revocation sought.
Thus, where the proponent of a will makes a prima facie showing of the formal execution and attestation of the will, the burden shifts to the will contestant to establish the facts which allegedly warrant denial or revocation of probate. Jacobs v. Vaillancourt, 634 So.2d 667, 671 (Fla. 2d DCA), review denied, 642 So.2d 746 (Fla.1994). When the validity of a will is challenged on the ground of undue influence, the contestant must prove the testamentary disposition resulted from the exercise of undue influence on the mind of the testator. The will contestant's initial burden can be met by proof of sufficient facts to raise a presumption of undue influence. In re Estate of Carpenter, 253 So.2d 697, 701 (Fla.1971).
A presumption of undue influence arises upon a showing that a party who (1) occupied a confidential relationship with the testator, (2) was a substantial beneficiary under the will, and (3) was active in procuring the instrument. Id.; Langford v. McCormick, 552 So.2d 964, 967 (Fla. 1st DCA 1989), review denied, 562 So.2d 346 (Fla.1990); Jordan v. Noll, 423 So.2d 368, 369 (Fla. 1st DCA 1983), review denied, 430 So.2d 451 (Fla.1983); Jacobs v. Vaillancourt, 634 So.2d at 671. The term confidential relationship encompasses those informal relationships based upon the trust or confidence one person reposes in another, as well as the more exacting fiduciary relationship between attorney and client. Carpenter, 253 So.2d at 701; Jacobs v. Vaillancourt, 634 So.2d at 670; Cupeiro v. Baron, 555 So.2d 370, 371 (Fla. 3d DCA 1989).
Each case involving allegations of active procurement of a will must be decided with reference to its particular facts. Carpenter, 253 So.2d at 702. In Carpenter, the court provided a non-exclusive list of factors for consideration in a determination of active procurement:
(a) presence of the beneficiary at the execution of the will; (b) presence of the beneficiary on those occasions when the testator expressed a desire to make a will; (c) recommendation by the beneficiary of an attorney to draw the will; (d) knowledge of the contents of the will by the beneficiary prior to execution; (e) giving of instructions on preparation of the will by *912 the beneficiary to the attorney drawing the will; (f) securing of witnesses to the will by the beneficiary; and (g) safekeeping of the will by the beneficiary subsequent to execution.
Will contestants are not required to show the existence of all the criteria to establish active procurement. Id. Where there is inequality of mental strength, active procurement can be shown by evidence of a request or suggestion by the dominant party. Cripe v. Atlantic First National Bank of Daytona Beach, 422 So.2d 820, 824 (Fla.1982). See also In re Estate of Reid, 138 So.2d 342, 349 (Fla. 3d DCA 1962) (higher degree of proof required to overcome inference of undue influence where testator is shown to have impaired mental powers or clouded intellect, than where the testator is in good health).
Once the presumption of undue influence arises, the burden shifts to the beneficiary of the will to come forward with a reasonable explanation of his or her active role in the preparation of the decedent's will. Cripe, 422 So.2d at 704; Langford, 552 So.2d at 967. If the beneficiary satisfies that burden, the presumption vanishes. Carpenter, 253 So.2d at 704. However, "since the facts giving rise to the presumption are themselves evidence of undue influence, those facts will remain in the case and will support a permissible inference of undue influence." Carpenter, 253 So.2d at 704. If the presumption is unrebutted, it alone is sufficient to sustain the contestant's burden. Cripe, 422 So.2d at 823. The standard of proof required of the moving party is preponderance of the evidence.
In the instant case, the trial judge found that appellee was in a confidential fiduciary relationship with the testator. We agree.[8] However, we disagree with the trial judge's finding that a presumption of undue influence was not established. In addition to the fiduciary relationship, the record demonstrates that appellee is a substantial beneficiary under the will. Moreover, application of the Carpenter "active procurement" factors to the particular facts of this case demonstrates that appellee was active in procuring the will. Although appellee was not present at the execution of the will, he was present and participated in discussions with the testator and the attorney who prepared the last will; he had knowledge of the contents of the will prior to its execution; he gave instructions to the attorney who prepared the will; and the will and trust documents were kept by him after their execution. Thus, the facts demonstrate the existence of five of the seven Carpenter "active procurement" factors. We conclude a presumption of undue influence was established in this case.
The trial judge next found that if the presumption was established, appellee rebutted it by competent testimony. In this regard, we affirm the trial judge.
Once the presumption of undue influence arises, the burden shifts to the beneficiary of the will to come forward with a reasonable explanation of his or her active role in the preparation of the decedent's will. Cripe v. Atlantic First National Bank of Daytona Beach, 422 So.2d 820, 824 (Fla.1982). According to In re Estate of Carpenter, 253 So.2d 697, 704 (Fla.1971), if the will beneficiary furnishes a reasonable explanation, the burden is satisfied, and the presumption vanishes. See also § 90.303, Fla.Stat.
In the case before us, the witnesses testifying in behalf of appellee presented an explanation for the involvement of the appellee in the activities surrounding the decedent's financial affairs.[9] The trial judge could accept it as reasonable, and apparently did so, since he found that while the appellee occupied a fiduciary relationship with the *913 decedent, the decedent controlled the situation "at all times." The trial judge further determined that in the later years of his life, the decedent established a parent-child relationship with the appellee which he was not able to accomplish with the other two children. He concluded, therefore, that "without a doubt," the appellee and others mentioned in the will and trust were the "natural and intended objects of decedent's bounty."
Although there was evidence that would have supported a different conclusion, our scope of review requires us to accept the factual findings of the trial court so long as there is support for them by competent substantial evidence. It is axiomatic that the trial court's resolution of conflicting evidence will not be disturbed by a reviewing court in the absence of a clear showing of error, or that the conclusions reached are erroneous. Shapiro v. State, 390 So.2d 344 (Fla.1980). In reviewing the trial court's findings, they must be given the benefit of all reasonable inferences that may be drawn from the evidence. Further, we are prohibited from reevaluating the evidence and substituting our judgment for that of the finder of the facts. See Helman v. Seaboard Coast Line Railroad Company, 349 So.2d 1187, 1189 (Fla. 1977). When we apply these rules to the case before us, we conclude that there was sufficient evidentiary support for the findings of the trial court.
In summary, we conclude the trial judge erred in finding that a presumption of undue influence was not established. The trial judge's alternative finding that if established, the presumption was rebutted is supported by the evidence and must be affirmed.
Accordingly, we affirm the trial court's denial of appellant's request to revoke probate.
BOOTH, J., concurs.
BENTON, J., dissents with opinion.
BENTON, Judge, dissenting.
As a result of events that transpired while Judge Brockwith the help of a special friendarranged his father's affairs, Judge Brock became the only one of the decedent's children to inherit from their father. The law looks askance at this sort of coincidence. "Since there was a confidential relationship and active procurement of a financial benefit, a presumption of undue influence arose." Cripe v. Atlantic First Nat'l Bank, 422 So.2d 820, 823-24 (Fla.1982). At the very least, this presumption placed on Judge Brock the burden as the "beneficiary [to] come[] forward with a reasonable explanation for his... active role in the decedent's affairs." In re Estate of Carpenter, 253 So.2d 697, 704 (Fla.1971).
Although the trial court concluded that the facts did not give rise to a presumption of undue influence, the majority opinion explicates admirably the reasons why this legal conclusion is incorrect. To recapitulate briefly: In the July before Dr. Brock's death in January, Judge Brock began playing an active role in his octogenarian father's financial affairs. Judge Brock helped create a trust under an instrument drawn by his father's divorce lawyer, with whom the judge had an illicit romance. He arranged for conveyance of his father's land to the freshly minted trust, which he controlled as trustee. He also caused his judicial assistant to prepare a power of attorney appointing him alone, to replace an earlier version naming his brother as an alternate. Judge Brock made use of this power of attorney to transfer several of his father's bank accounts to the judge's control. The majority is eminently correct in concluding that proof of these activities (among others) gave rise to a presumption of undue influence. Cripe; Carpenter, In re Palmer's Estate, 48 So.2d 732 (Fla.1950).
Although the cases are less than crystal clear as to the precise effect of the presumption, compare Thomas for Fennell v. Lampkin, 470 So.2d 37 (Fla. 5th DCA 1985) with Jordan v. Noll, 423 So.2d 368 (Fla. 1st DCA), review denied, 430 So.2d 451 (Fla.1983); see In re Estate of Davis, 462 So.2d 12 (Fla. 4th DCA 1984), there can be no doubt that a presumption of undue influence, if unrebutted, requires reversal. E.g., Cripe; Palmer. The trial court rejected a physician's testimony that Dr. Brock suffered from dementia, and credited other witnesses' countervailing *914 testimony. On appeal, the finding of testamentary capacity is not an issue. But the presumption of undue influence is a separate matter.
Language earlier in the Cripe opinion notwithstanding, the decision in Cripe demonstrates that an appellate court is not without authority to overturn the judgment of a trial court that has found a lack of undue influence, when the "facts raised a presumption of undue influence, which ... had to [be] rebut[ted] in order to prevent a finding of undue influence based on the presumption," 422 So.2d at 824, where, in the opinion of the appellate court, the presumption went unrebutted. Accord Clark v. Grimsley, 270 So.2d 53 (Fla. 1st DCA 1972); In re Reid's Estate, 138 So.2d 342 (Fla. 3d DCA 1962).
While the Carpenter opinion talks about vanishing presumptions, it does not contemplate that a presumption of undue influence will vanish until and unless "the beneficiary comes forward with a reasonable explanation for his or her active role in the decedent's affairs." 253 So.2d at 704. What was the explanation here for Judge Brock's involvement in obtaining control of his father's assets for himself? The trial court did not address this question except to say, in its JUDGMENT AND ORDER, when detailing its reasons for concluding (erroneously) that a presumption of undue influence had not been established, that "if it had been, petitioner rebutted it by competent evidence."
Testimony as to Dr. Brock's feistiness and as to his relationships with his sons over the years does not explain why one son was eliminated as a beneficiary after Mr. Isler's involvement ended. The evidence did not dispel the presumptionwhich the majority concedes arosethat undue influence led Dr. Brock to change his mind between August 27, 1993, and September 18, 1993. During the critical twenty-two-day interval, while Dr. Brock was suffering from leukemia, among other ailments, his only advisors on these matters were Judge Brockthe beneficiary presumed to have exercised undue influenceand Judge Brock's paramour. Concluding that Judge Brock failed to meet either the Carpenter burden or "`the burden... to show that the will was executed freely and without his influence,'" In re Aldrich's Estate, 148 Fla. 121, 3 So.2d 856, 860 (1941) (Brown, J., concurring) (citation omitted), I respectfully dissent.
NOTES
[1] In the trial proceeding, the appellant also had challenged the testamentary capacity of the decedent. That issue was decided adversely to appellant and has not been raised on appeal.
[2] The consultations with Mr. Isler occurred during a period when Dr. Brock was resolving the financial aspects of his third divorce.
[3] Appellee discovered the errors when he reviewed the documents prepared by Mr. Isler. He interlineated the correct names and returned the documents for correction.
[4] The record suggests that Dr. Brock was very concerned that persons might take financial advantage of him.
[5] The letter was written after a conversation with appellee, in which appellee told Ms. Clyatt that a good lawyer would apprise his father of inaccuracies in the Isler documents.
[6] Ms. Clyatt had no explanation for appellee's creation of the second durable power of attorney dated October 1, 1993.
[7] The non-final order unfreezing assets was the subject of an earlier appeal. In an opinion filed September 27, 1995, this court reversed and remanded the order releasing assets, with directions to reinstate the freeze order until such time as the appeal from the order upholding the validity of the will was decided. Brock v. Brock, 667 So.2d 310 (Fla. 1st DCA 1995).
[8] At oral argument of this cause, appellee's counsel properly conceded that appellee had a fiduciary obligation to the testator.
[9] Among other things, the witnesses testified the decedent sought assistance and advice from appellee, an attorney, in connection with the decedent's divorce proceedings and related financial disputes. The testimony suggests the decedent was lonely and regretted the years of estrangement from his children. The trial court could infer that through the vehicle of requesting legal advice from his attorney son, the decedent was able to initiate a contact which ultimately led to the development of a relationship with one of his children.