811 So.2d 822 (2002)
John W. HACK, Tarinee Williams, et al., Appellants,
v.
The ESTATE OF Dorothy T. HELLING, et al., Appellees.
No. 5D00-2394.
District Court of Appeal of Florida, Fifth District.
March 22, 2002.
*823 Robert C. Wilkins, Jr., of Dittmer, Wohlust & Wilkins, P.A., Maitland, for Appellants.
Jack B. Nichols, Orlando, for Appellee Lorraine A. Janes.
No Appearance for Appellee The Estate of Dorothy T. Helling.
SHARP, W., J.
John Hack, Tarinee Williams, Alan Williams, Mary Ann Bertino, Diane Bertino Casey, Dawn Bertino Mattson and the Orlando Humane Society appeal from an order of the probate court which admitted the decedent's (Dorothy Helling) November 1992 will to probate. The appellants are beneficiaries under a prior will executed by Helling in December 1990. They challenged the November 1992 will on grounds that Helling lacked testamentary capacity to execute it, and that it was procured by undue influence exercised by Lorraine Janes. At the close of appellants' case in a lengthy non-jury trial, Janes, the proponent of Helling's 1992 will, and her personal representative, moved for a directed verdict.[1] Because we think that at this point in the trial the appellants had presented a prima facie case of lack of testamentary capacity, as well as undue influence on the part of Janes pursuant to In re Carpenter's Estate, 253 So.2d 697 (Fla.1971), the burden was shifted to Janes to overcome the presumption of undue influence, and it was error to direct a verdict in appellee's favor. Accordingly, we reverse and remand for further proceedings.
In reviewing the record, we must view the evidence presented in a light most *824 favorable to the appellants.[2] Appellants established that they were the beneficiaries under Helling's will executed in 1990, drafted by attorney Irving Pugh. Helling devised her home to her nephew, Hack, and her niece Mary Ann Bertino. She left $10,000 each to Mary Ann's daughters (Dawn, Deborah, and Diane) and $100,000 to the Orlando Humane Society. The residue she bequeathed to her friend, Williams and her husband. Helling was a widow and lived alone. She had no children. The persons named above were her only relatives, except Williams who was a close friend. Helling loved cats, hence her bequest to the Orlando Humane Society.
There was considerable testimony about the deteriorating state of Helling's health and mental status after 1990. She was elderly (in her late 70's), and had become easily upset, forgetful, agitated and tired. She was admitted to the hospital in February 1992, for hip pain and mental confusion. Several physicians expressed the view that she probably had Alzheimers, was demented, and lacked sufficient mental capacity to make a will. One doctor testified in his deposition that when he saw Helling in February 1992, she was "profoundly demented" and he would not have expected her to meet the standard for capacity to make a will. When family members visited her after her release from the hospital, she was thin, in disarray, and made no sense at all. She also did not appear to recognize her family members.
At this point in February of 1992, Janes took over Helling's care completely and by one means or the other, cut off Helling's contacts with Williams and her relatives, her former friends, and others. Janes also took control of Helling's finances, paid her bills, and had herself placed on Helling's accounts. Janes had attorney McCormick prepare a general "family power of attorney," which she used beginning in 1992 until 1995 when Helling's guardianship commenced.
Helling was hospitalized again in March of 1992 and indicated a desire to go home with Hack, but no one contacted him and he was unable to get information from Janes about his aunt. Helling was hospitalized again in June of 1992, and when her relatives visited her, she did not know who they were. Helling warned Hack's wife the mob was after her and she should not get involved.
Hack learned Helling had given Janes a power of attorney in 1992. He was concerned about Helling's welfare and finances. He filed a complaint with HRS in 1992, but after an investigation, the agency reported no problems.
Hack could not locate Helling in 1995. He filed another complaint with HRS and discovered Helling had been placed in the Azalea Manner Nursing Home by Janes. Helling was completely incapacitated at that point. Her living conditions were poor. Hack sought and was appointed Helling's guardian, over the protest of Janes who also petitioned to be appointed her guardian. The probate judge chose Hack because he perceived a problem with undue influence and Janes. Hack moved Helling to a superior nursing home facility where she died in 1998.
A few days after Helling was released from the hospital in February of 1992, she "reviewed" and marked up her 1990 will. Although there is evidence to the contrary, this was done in the presence of Janes and her husband. They made arrangements for Helling to go to attorney McCormick's *825 office that day to execute a new will which was also especially prepared that day. One of them drove her to the office and brought the old will to McCormick.
Although McCormick had no prior relationship with Helling, he had represented the Janes in many prior transactions. One was handling the probate of another old lady's estate for whom Janes was the personal representative and a beneficiary. Like Helling, Janes had assumed a caretaker role for that lady also, at the close of her life. Janes explained she was their neighbor and did not work, so she had time to help them out.
In the February 1992 will, Helling appointed Janes her personal representative and dropped her relatives and Williams, as beneficiaries. She left $100,000 to the Humane Society and the residue to Janes and Janes' daughter, whom Helling barely knew.
In June of 1992 when Helling was again hospitalized, Janes contacted McCormick to go to the hospital and to prepare a codicil to the will, as well as informing him what its contents should be. The bill for the preparation of the codicil was sent to Janes, as was the codicil.
In the codicil, Helling reduced the bequest to the Orlando Humane Society to $40,000 and she left $40,000 to Janes and her daughter to care for her cats, Sammy and Mitzi. Upon the death of the cats, Janes and her daughter would take the remainder. However, at the time Helling executed the codicil, Sammy and Mitzi were no longer being cared for by Helling's vet. Witnesses testified that Sammy and Mitzi died in 1992. Helling did have two other cats, Payne and Tina Tot, but they were not mentioned in the codicil.
Helling later executed another will drafted by McCormick in November 1992, which restated and reincorporated the provisions of the February 1992 will and the codicil. McCormick was contacted by Janes or a member of her family about preparing this will also. The Janeses brought Helling to McCormick's office for its execution, although they remained in the reception area. The Janeses had possession of the 1992 wills and they brought them to McCormick in 1995, prior to the guardianship hearing.
An involuntary dismissal or directed verdict is properly entered only when the evidence considered in the light most favorable to the non-moving party fails to establish a prima facie case on the non-moving party's claim. Wimbledon Townhouse Condominium I Ass'n, Inc. v. Wolfson, 510 So.2d 1106, 1109 (Fla. 4th DCA 1987).
In this case, appellants presented a prima facie case, although there was disputed evidence in the record, that Helling lacked sufficient mental capacity to execute any of the 1992 testamentary documents. In ruling on such a motion, the trial court may not weigh and judge the credibility of the evidence. Bottalico v. Antonelli, 695 So.2d 363 (Fla. 4th DCA 1997); Foster; Thalgott. But, in its written ruling, the court clearly stated it considered the "weight and credibility" of the evidence and testimony presented at trial, and found Janes' witnesses more credible than the appellants' on the issue of lack of testamentary capacity and undue influence.
At this directed verdict stage, the court also improperly placed the burden of proof of undue influence on appellants, contrary to Carpenter. In its written order, the court stated that appellants did not prove by the preponderance of the evidence that Helling was unduly influenced by Janes. But, pursuant to Carpenter, once a prima facie case of undue influence is presented, the burden shifts to the proponent of the will (Janes here) to *826 establish a reasonable explanation for her activities in procuring the will, as well as a reasonable explanation for the decedent's changed testamentary plan. It is improper to enter summary judgment or direct a verdict against a party who has the burden of overcoming the presumption of undue influence. In re Knight's Estate, 108 So.2d 629 (Fla. 1st DCA 1959).
The classic three Carpenter[3] factors appear to have been established by this record. First, Janes was a substantial beneficiary of the 1992 will. Second, she occupied a confidential relationship with Helling. And third, the Janeses were active in procuring the will within the criteria laid out by Carpenter. Active procurement was shown because Janes was present when Helling expressed a desire to make a change in her will. Although the Janeses were not present in the room when the wills were executed, they procured their attorney to prepare the will. Janes dictated the contents of the will to the attorney. The Janeses arranged for Helling's transportation to the place where the wills were executed, and they were nearby in the reception room when Helling executed the wills. Not all of the criteria listed in Carpenter need be shown in order to establish active procurement, but in this case enough was shown.
In addition, although not part of the Carpenter criteria, the inequality of mental capacity and strength between the testatrix and the party with the confidential relationship is a factor in determining active procurement. Estate of Brock, 692 So.2d 907 (Fla. 1st DCA 1996), rev. denied, 694 So.2d 737 (Fla.1997). Helling's failed mental capacity even if arguably insufficient to show lack of testamentary capacity, is a factor which should be considered, as supporting the undue influence claim. See In re Palmer's Estate, 48 So.2d 732 (Fla.1950).
There are authorities who take the position that the presumption of undue influence, once raised, never shifts back to those attacking the will because the presumption is based on public policy.[4] The defender of the challenged will has the burden of proving the absence of undue influence. However, Florida cases uniformly hold the presumption of undue influence "vanishes" once the proponent of the will provides a reasonable explanation.[5]
As noted above, at the point in this trial when the verdict was directed, the presumption had arisen. The balance of the trial is needed to determine whether the presumption can be overcome by a reasonable explanation. In re Knight's Estate, 108 So.2d 629 (Fla. 1st DCA 1959). If not, the appellants should prevail. See Cripe v. Atlantic First National Bank of Daytona Beach, 422 So.2d 820 (Fla.1982); In re Van Aken's Estate, 281 So.2d 917 (Fla. 2d *827 DCA 1973); Clark v. Grimsley, 270 So.2d 53 (Fla. 1st DCA 1972).
If the presumption falls after a reasonable explanation is established, as the Florida cases hold it does, those facts tending to prove the presumption still remain and can serve as a basis to find undue influence. In re Lamberson's Estate; Sun Bank/Miami N.A. v. Hogarth, 536 So.2d 263 (Fla. 3d DCA 1988), rev. denied, 545 So.2d 1369 (Fla.1989). The outcome should depend on the credibility and weight of the evidence assigned by the trier of fact to appellants' cross-examination of appellees' reasonable explanation testimony and to the rebuttal testimony offered by appellants. In sum, this case was prematurely decided and must be remanded for a new trial.
REVERSED and REMANDED.
PLEUS and ORFINGER, R.B., JJ., concur.
NOTES
[1] Since this was a non-jury trial, appellee should have moved for an involuntary dismissal, rather than a directed verdict. Rehabilitation Advisors, Inc. v. Floyd, 601 So.2d 1286 (Fla. 5th DCA 1992); Thalgott v. Thalgott, 571 So.2d 1368 (Fla. 1st DCA 1990). In any event, the same law is applicable to both motions. Foster v. City of Gainesville, 579 So.2d 774 (Fla. 1st DCA 1991).
[2] Natoel v. Royal Caribbean Cruise, Ltd., 657 So.2d 26 (Fla. 3d DCA 1995); Texaco, Inc. v. Giltak Corp., 492 So.2d 812 (Fla. 1st DCA 1986); Fincher Investigative Agency, Inc. v. Scott, 394 So.2d 559 (Fla. 3d DCA), rev. denied, 402 So.2d 609 (Fla.1981); Allen v. Dutton's Estate, 394 So.2d 132 (Fla. 5th DCA 1980); rev. denied, 402 So.2d 609 (Fla.1981).
[3] It is established in Florida that if a substantial beneficiary under a will occupies a confidential relationship with the testator and is active in procuring the contested will, the presumption of undue influence arises. In re Carpenter's Estate, 253 So.2d at 700.
[4] See In re Estate of Davis, 462 So.2d 12 (Fla. 4th DCA 1984) (Glickstein, J., concurring specially); In re Swan's Estate, 4 Utah 2d 277, 293 P.2d 682 (1956); Charles W. Ehrhardt, Florida Evidence §§ 303.1 and 304.1 (2001 ed.), citing § 90.303, Florida Statutes (the Evidence Code).
[5] See Elson v. Vargas, 520 So.2d 76 (Fla. 3d DCA), rev. denied, 528 So.2d 1181 (Fla.1988) (presumption vanishes, once a reasonable explanation of evidence is presented, leaving the challengers of the will with the ultimate burden of proof of undue influence); Ahlman v. Wolf, 483 So.2d 889 (Fla. 3d DCA 1986); In re Lamberson's Estate, 407 So.2d 358 (Fla. 5th DCA 1981); Allen v. Dutton's Estate, 394 So.2d 132 (Fla. 5th DCA 1980), rev. denied, 402 So.2d 609 (Fla.1981).