973 So.2d 1227 (2008)
Robert PEREZ, Appellant,
v.
Laurie PEREZ, Appellee.
Nos. 4D06-4036, 4D06-4327.
District Court of Appeal of Florida, Fourth District.
January 23, 2008.
*1228 Gene Reibman, Fort Lauderdale, for appellant.
Lisa J. London of Law Offices of Mark S. London, P.A., Hollywood, for appellee.
PER CURIAM.
Robert Perez (former husband) appeals an order denying his motion to modify his alimony and child support obligations. As grounds for the modifications, the former husband alleged he suffered a permanent reduction in his income and that one of his minor children had reached the age of majority. The trial court entered a "directed verdict" at the close of the former husband's case, finding that the former husband had failed to present a prima facie case that his loss of income was permanent. Because the evidence showed that the former husband's income had been severely reduced for nearly a year, with no end in sight, we reverse. We also accept the former wife's concession of error as to the need for a child support modification upon the child reaching the age of majority.
The parties were married in 1984. They had three children of the marriage. The former wife has a college education. The former husband has only a high school education.
The petition for dissolution was filed on September 30, 1999. The former husband's first financial affidavit, dated November 10, 1999, showed him to be employed in "Advertising media/mailing list broker." It is undisputed that he has been in this business for at least 23 years and it is his only area of skill. His employer was Gnames Advantage, L.P. He listed gross income for 1998 of $149,610.
A final judgment of dissolution of marriage was entered on July 12, 2001. Pursuant to an incorporated Marital Settlement Agreement, former husband was *1229 ordered to pay child support of $2,100 per month. The incorporated Marital Settlement Agreement imputed income of $20,000 a year to the former wife and found the former husband's total compensation to be $250,000 per year. The former husband was ordered to pay permanent periodic alimony of $6,100 per month.
By May 2002, the former husband moved to modify the alimony and child support, alleging a "substantial financial setback" to his business, substantially reducing his income. On January 15, 2003, the former husband filed an amended financial affidavit which showed his gross monthly income to be $9,338.
In a July 24, 2003 "final judgment," the trial court found that "since entry of the Final Judgment of Dissolution of Marriage, there has been a substantial material, involuntary and unanticipated change in circumstances in the Former Husband's (sic) which has been substantially reduced due to a setback in the business of Gnames Advantage in which the former husband has a 37.5% ownership interest. The business has suffered a serious financial setback." The court found that the former husband's gross income had been reduced to $9,577.33 a month. The court also found that the parties' oldest son had reached majority on August 29, 2002. Thus, the court reduced the former husband's alimony roughly in half, to $3,000 a month, and reduced his child support to $1,300 per month, retroactive to the date that the oldest son turned eighteen.
On June 21, 2005, the former husband filed a new motion to modify his alimony. The motion and accompanying financial affidavit alleged a reduction in his gross income from $9,577.33 a month to $7,275.00 per month as a result of his loss of his 37.5% ownership interest in Gnames Advantage, which he had been forced to give up as part of his Chapter 7 bankruptcy proceeding.
On November 22, 2005, the former husband filed a motion to modify child support, which alleged that a second child had reached the age of majority and that the former husband had now lost his job. The fact that the middle child reached majority in November 2005 is undisputed. It is also undisputed that the former husband lost his job in September 2005 and has since started a new business.
In March 2006, the former husband filed a new financial affidavit showing total monthly gross income of $1,263. The financial affidavit showed net monthly income after deductions of minus $696 and monthly expenses of $2,758, for a net monthly deficit of $3,453. The affidavit showed a net worth of minus $87,972.
The former wife filed a new financial affidavit showing her new occupation as a real estate agent. She listed a gross monthly income of $1,000, net income of $550.00 per month, and monthly expenses of $8,300.52, for a monthly deficit of $7,750.52. The former wife listed assets of $318,706.74 and liabilities of $21,323.00.
In August 2006, the former husband filed a new financial affidavit showing that he had started a company that works on a commission basis, and that his current monthly gross income was $2,375. After deductions, his net monthly income was $190 and his total monthly expenses were $3,283, for a deficit of $3,092 per month. His total net worth was listed at minus $145,139.
The former husband testified that he was discharged from his employment at Gnames in September 2005. He received a 60-day severance. He then sought unemployment benefits as he attempted to establish a new business and seek employment. The former husband testified that *1230 he currently works out of his home. He started his new business in the direct marketing business (both direct mailing and Internet marketing) almost immediately upon being notified of the termination of his employment. He has worked full-time in the new company since then. Another company lent him $52,000 to make a go of the new business. His new company, Rap Interactive, earned approximately $2,000 in the month of July 2006. In the month of August it received $3,000. These were the first revenues the company earned. He does not know what the new company will ultimately earn. However, former husband testified that his financial situation is permanent. He explained:
The income that I used to enjoy, that over a seven to ten-year period consistently showed a pattern of decline. Which is why we've been back into the court several times. . . .
I primarily have catered to direct mail marketing accounts. And the direct mail economic model has been strained for a variety of reasons, beginning with the fact that the cost of paper and postage and printing has consistently gone up. Response rates due to competition and mail saturation have gone down. Due to government regulation on what had become a fairly large industry made a number of large companies go out of business, major well-known companies, like American Family Publishers, like Fingerhut Corporation, and many other large companies have gone out of business. And the revenue began to atrophy in the trade as a result.
The mailing list generated by those large companies were not available to fuel other direct mail promotions. So the volume of direct mail started to decline for all of those reasons.
The advent of the Internet as a way to spend money to direct market has started to take hold and become a vibrant way to market. And has been competing with direct mail dollars or shares of those revenues. That has led to an awareness of multichannel marketing. So direct marketing companies that primarily used to direct mail are now spending money in multiple other channels like the Internet.
And all of those things are not going to change and reverse themselves anytime soon in the months or years to come. That is a permanent condition. It was a very clear pattern of atrophy, not just on my part, on the part of my business, but an industry-wide pattern that Mr. Batrouney can also testify to.
Regarding his attempts to find employment with another company in the industry, the former husband testified:
The problem with my type of job is that it's sales and commission oriented. And without no established book of clients and no ongoing revenue that a perspective (sic) employer could count on, what they're looking at is essentially paying me an accruing mountain of outgo dollars, along with funding my travel and business development expenses, with being in a business where there's a long term time frame associated with securing accounts, booking business that's booked into future marketing campaign dates that are collected sometime after that. There is a long lead time for revenue.
So without an established book of business, most companies are reluctant to hire someone, given that cash flow scenario that I've described.
So, no, I have not received offers of employment, primarily, they tell me, pretty directly for that reason.
Currently, his day-to-day needs are being provided by his new wife. He received unemployment compensation for a while, but 80% of that was used to pay alimony. *1231 He has borrowed from family members to pay child support and health insurance.
The former husband presented the expert testimony of Geoffrey Batrouney, a former employer. He has been in the mailing list business since 1982. He has written numerous articles for trade publications and lectured at dozens of conferences on the subject of mailing lists. He has testified as an expert in list marketing on four prior occasions. Batrouney testified that due to the factors identified by the former husband in his testimony, in the last five years the economic model for the mailing list business is "far tougher." He testified that one needs an established book of clients typically within the industry to have recurring income. Unlike the mailing list business, which was relationship-based, the Internet tends to be an impersonal series of individual transactions, which is not conducive to recurring income. He does not know how much money can be made on the Internet.
When the former husband rested, the trial court granted the former wife's motion for "directed verdict" "because there's no permanent change that I can find based on two months." She added, "I understand that he doesn't have a present ability to pay what his award is." "I have to be basing it on something other than two months that first started at $2,000 and then is up to 83,000 gross earnings for a brand-new business that includes the Internet, which is supposedly the way to go." The court added that the former husband was "well on his way to re-establishing himself' and cited as, evidence the fact that his income had increased from $2,000 to $3,000 in one month, "A thousand dollar a month increase." She added "for the record" that she did not find the former husband's testimony to be credible.
In her September 1, 2006 written "final judgment" denying the former husband's petitions, the trial court accepted that he was discharged from his employment with Gnames Advantage in September 2005. The trial court found that the former husband's current alimony and child support obligations were being calculated based on an annual income of $114,928. She found that at the time of the filing of the supplemental petition for modification, his income was $87,300. The trial court concluded:
That the Former Husband's testimony lacked credibility in that there was an insufficient showing of permanency to justify a modification, though intimated that the Former Husband did not have the economic ability to pay.
The decretal portion of the final judgment contained an error, but was corrected by an amended final judgment dated October 9, 2006.
A defendant's motion for judgment at the close of the plaintiffs case in a nonjury trial is properly denominated as a motion to dismiss rather than a motion for directed verdict. Hack v. Estate of Helling, 811 So.2d 822, 823 h. 1 (Fla. 5th DCA 2002); Bottalico v. Antonelli, 695 So.2d 363 (Fla. 4th DCA 1997); Townsend v. Ward, 429 So.2d 404, 407 n. 3 (Fla. 1st DCA 1983). In reviewing the record, we must view the evidence presented in a light most favorable to the plaintiff. Hack, 811 So.2d at 823.
An involuntary dismissal is properly entered only where the evidence considered in the light most favorable to the nonmoving party fails to establish a prima facie case. Id. at 825; Bottalico, 695 So.2d at 363. The trial court may not weigh and judge the credibility of the evidence. Hack, 811 So.2d at 825; Bottalico, 695 So.2d at 363; Martucci v. Green Kroll Corp., 483 So.2d 789 (Fla. 4th DCA 1986). Clearly, the trial court violated this rule by finding that the former husband's testimony was not credible.
*1232 Where the "circumstances or the financial ability of either party changes" either party may apply to the circuit court for an order decreasing or increasing the amount of alimony. § 61.14(1)(a), Fla. Stat. (2006). In petitioning to permanently modify alimony, the moving party must show: 1) a substantial change in circumstances; 2) that the change was not contemplated at the time of the final judgment of dissolution (or, in this case, at the time of the last permanent modification); and 3) that the change is "sufficient, material, involuntary and permanent in nature." Pimm v. Pimm, 601 So.2d 534, 536 (Fla. 1992). Only the permanency of the change is at issue in this case.
In Woolf v. Woolf, 901 So.2d 905, 912 (Fla. 4th DCA 2005), we stated:
The "permanency" of the former husband's financial situation is not discussed by the parties or the court below. Since the condition had lasted over a year at the time of the final hearing, with no apparent end in sight, it should be deemed sufficiently permanent. See Haas v. Haas, 552 So.2d 252 (Fla. 4th DCA 1989) (finding that a physician's loss of staff privileges and surgical practice due to alcoholism was sufficiently permanent despite fact that he had since regained his board certification).
In this case the former husband's severe loss of income had persisted for nearly a year at the time of the final hearing, "with no apparent end in sight." Although the trial court considered the former husband's $1000 increase in income during the two months leading up to the hearing as evidence of his return to financial health, the evidence, when viewed as a whole, did not demonstrate this.
The trial court expressly recognized that the former husband could no longer afford to pay his alimony, yet speculated that this circumstance would change in the foreseeable future. See Brown v. Cannady-Brown, 954 So.2d 1206, 1209 (Fla. 4th DCA 2007) (holding that there must be competent substantial evidence in the record to support the level of income imputed to a spouse); see also Alois v. Alois, 937 So.2d 171, 175 (Fla. 4th DCA 2006) (noting that basic rule of fairness prevents court from ordering a parent to pay child support "which that parent cannot afford to pay").
The former wife concedes error in the trial court's failure to reduce the former husband's child support payment due to a second child reaching the age of majority. This concession is well-taken. See Yockey v. Yockey, 784 So.2d 582 (Fla. 4th DCA 2001) (holding that trial court abused its discretion in not retroactively modifying child support to date of petition where child had previously reached age of majority). Moreover, the former husband may be entitled to an even further reduction of his child support for the same reasons that he appears entitled to a reduction in his alimony. Swanson v. Swanson, 888 So.2d 117 (Fla. 4th DCA 2004).
Because the trial court abused its discretion in failing to order a reduction in the former husband's alimony and child support obligations, we reverse the order on appeal and remand for further proceedings consistent with this opinion.
Reversed and Remanded.
SHAHOOD, C.J., FARMER and TAYLOR, JJ., concur.